## SUPREME COURT—IN EQUITY.

### L. KEELIKOLANI *vs.* JAMES ROBINSON.

In the year 1827 there was no fixed or uniform law of inheritance, such as has existed for the last twelve or fifteen years; and, although the fact of a general transmission of the possession of lands seems well established, yet such transmission was not governed by well defined rules or uniform custom.

The complainant, as the representative of the original owner of the premises in question, not having ever obtained a Land Commission Award of the said premises, was considered as entitled to a fee simple patent from the Government upon payment of the usual commutation, said patent to be based upon the award made in favor of her co-tenant and bailiff.

Under the agreement made by the respondent with the ancestor, by which the respondent should occupy and improve a certain wharf premises in Honolulu, and account and pay over one half of all the monies received for the use of the said wharf and premises to the original owner, his heirs, etc.—one half of the expenses in repairing, improving, etc., to be borne by each; the respondent was regarded as a co-tenant. Also, having recognized, for thirty-four years, the successive heirs to the property and those claiming an interest by making payments to them from time to time, and suffering no disturbance in his possession, the Court refused to adjudicate upon what might be the rights of the Government or any third parties—no such counter claims being before the Court—and the heirship of the complainant having been proved, the respondent was decreed to account to her for all the monies received for the use of the said wharf and premises.

ALLEN, C. J.

The bill and answer in this case have been so fully set forth in the decision, which has hitherto been given by the Court on a demurrer to the bill, that I regard it unnecessary to present them in full again, and will only refer to them in discussing the positions taken by the parties.

The execution of the agreement of the 11th of January, 1827, by and between Kalaimoku and the respondent, which is set forth in the bill, is admitted; and further, that the respondent, in pursuance of said agreement, entered into possession of the premises as tenant in common with Kalaimoku, and has continued to occupy a portion of the premises till the time of filing the amended bill, and avers that the other portion has been taken possession of by the Governor of Oahu for the use and benefit of the Hawaiian Government.

L. Keelikolani *v.* James Robinson.

It is specially alleged in the bill that the respondent presented to the Board of Land Commission a claim based on the agreement of the 11th January, 1827, in which he set forth that he was 'deprived of a portion of the land supposed to be included in said agreement, and that His Excellency Mataio Kekuanaoa, acting for the heir of Kalaimoku, having agreed to add to the portion described in said bill as Part No. 1, that portion described as Part 2 ; that the said Board confirmed the claimant, the present respondent, his heirs, executors, administrators and assigns, in the same rights and privileges in the lot commonly called the " Point," and now including the additional piece under part No. 2, as they are designated in the survey set forth in the bill, as were granted in the original agreement and given in full in the award, and subject at the same time to the same rules and conditions as are therein contained ; that the agreement was confirmed by the Board in its application to the claim as presented. It is alleged that the agreement by which Part 2d was substituted for whatever ground may have been taken from that included in the agreement of the 11th January aforesaid was made during the year 1851, and that, in pursuance thereof, the respondent entered upon the second part, and continued to occupy the same till the day of the filing the bill, and has received large sums of money and profits for the use and occupation of lots No. 1 and 2.

The counsel for the respondent says " that they admit the presentation of the claim based on the agreement, and that the Board made an award ;" and that they set forth all the proceedings had therein, but deny entering into any agreement with Kalaimoku or his heirs, other than the original one dated 1827, in relation to the premises described therein.

It appears by the award and by all the testimony having reference to it, that it was claimed and rendered by virtue of this agreement. It further appears that the present respondent claimed an equivalent, on account of some infraction of the original agreement, which caused a long suspension of the case. At length there was a final settlement by mutual concession, satisfactory to both parties concerned—the representative of the grantor, M. Kekuanaoa, with the approval of the Hawaiian Government, consented to an addition of a piece of ground to

the original lot, in lieu of the alleged deprivation; and there appearing no counter claimant, this modification of the agreement was made. Whereupon the Board confirmed the respondent, his heirs, executors, administrators and assigns in the same rights and privileges in the lot commonly called the "Point," and now including the additional piece under Part 2, as they are both designated in their metes and bounds by a survey of T. Metcalf—as were granted in the original agreement, and subject to the same rules and conditions as are therein contained; and that said instrument is confirmed by this Board in full application to the present claim, and correctly described in the surveys of Part 1 and 2, as set forth in said bill.

It is admitted that all the claim the respondent had to present to the Land Commission, was based on the agreement of Kalaimoku; and it is equally clear that he made an effort to obtain an equivalent for the portion of land which had been added to the fort. This caused some delay in the proceedings; but at length an agreement was made by the representative of the grantor, Kekuanaoa, with the consent of the Hawaiian Government, that a piece of ground, which is called Part No. 2, should be added to the original lot, in lieu of the alleged deprivation; and the award was made accordingly. It is alleged in the award that "obstructions to a final settlement were removed by mutual concession, satisfactory to both parties concerned." Who were these parties, but the claimant for the award under the agreement, the present respondent, and M. Kekuanaoa, the representative of the heirs of the grantor?

What moved the Board to include in an award to the claimant a piece of land not included in the original agreement, unless it was to satisfy him for the piece of which the parties to the original agreement had been deprived? Is it not equally clear that he complained of the heirs of Kalaimoku, and claimed that they should make an equivalent to him for the injury he had suffered by the loss of a piece of the land included in the original agreement? Unless there was a clear understanding between those parties, why was it that the Board declared in their award that the terms and conditions of the agreement should apply to lot 2, as well as to the original lot called by them lot 1? It is in evidence that on the fourteenth day of

June, 1850, an agreement was made and executed by and between John Ii, the guardian of John Pitt Kinau, the son and heir of Leleiohoku, and Keelikolani, his mother, and the widow of Leleiohoku, for a settlement and division of their respective interests in the real property of said estate, in which the widow relinquished her right of dower in certain lands therein specified, one of which is that part of Pakaka in the possession of the respondent, makai of "the stone wall." The consideration for this relinquishment of dower was that she should enjoy the entire use of certain other lands during her life, one of which is that part of Pakaka situated mauka of the "stone wall." At that time the guardian of the minor was authorized by law to make the agreement.

It appears in evidence that M. Kekuanaoa is the father of complainant, who was then a widow of Leleiohoku, and who held No. 2 as an allotment of dower, and that she was the mother of John Pitt Kinau, who claimed to be the heir of the rights of his father Leleiohoku, in Lot 1, called the "Point," and in the agreement with the claimant before the Land Commission.

It is reasonable to suppose that M. Kekuanaoa would have represented his daughter and her son before the Board to make the best efforts in his power to repair any injury which had arisen to the parties to the original agreement, by being deprived of a part of the King's Wharf. By those who claimed to have inherited all the rights that Kalaimoku had in the King's wharf, and by virtue of the original agreement, this consideration was given, and a modification was made in the agreement, in the nature of an additional article. It is very evident that the award of lot No. 2 was made expressly on the surrender of the claim of Keelikolani, and as the Board say, in lieu of what had been taken from the original lot as described in the agreement. All the rights which the respondent asserted before the Land Commission, were derived from the agreement with Kalaimoku for lot 1, and the agreement made before the Land Commission with his representatives for lot No. 2.

It is further alleged in the bill, that Kalaimoku died in October, 1827, leaving as his sole heir his son Leleiohoku, who inherited the property described therein; and that he was ac-

knowledged to be the heir by the King, and was treated and considered as the inheritor of the said property, by the respondent. The respondent admits that he did regard Leleiohoku as having the inheritance as alleged ; but avers that he has good reason now to believe that he may have been in error in so treating and considering said Leleiohoku, as he has been informed, and verily believes ; that another than Leleiohoku, claimed to be the heir of Kalaimoku, to whom was granted the entire charge of his estate after his decease, in the presence and with the approval of his late Majesty Kamehameha III.

The counsel for the respondent say, that the first material allegation in the bill which they deny, except what is not refuted by all the proceedings of the Board of Land Commissioners, is that Kalaimoku deceased, leaving Leleiohoku his sole heir. They admit that it is proved that Leleiohoku was the only son of Kalaimoku, by his acknowledgment, and by common repute, and that if there was a law regulating the descent of an ancestor's estate to his son, or child of his body, to the exclusion of all others, Leleiohoku has been proved to be the heir of his father's estate—still they insist that there was no certain fixed rule of the descent of property, and that the Court can not administer justice except on fixed rules. The Court have hitherto examined this question, and while they have given an opinion that there was a common law of inheritance, liable to be modified or defeated, but perfectly good until such an event; at the same time they expressed a willingness to hear testimony upon the subject of the descent of the property, at a period before there was any written law.

In the declaration of principles made by the Board of Commissioners to Quiet Land Titles, they declare in substance, that when the Islands were conquered by Kamehameha I., he followed the example of his predecessors, and divided the lands among his warrior chiefs, retaining a portion in his own hands, to be cultivated and managed by his own immediate servants or attendants. Each principal chief divided his lands anew, and gave them to an inferior order of chiefs, by whom they were subdivided again and again. All those persons were considered to have rights in the lands, or in the productions of them. These rights were not clearly defined, but were, never-

theless, universally acknowledged. It is expressly declared that the superior always had the power, at pleasure, to dispossess his inferior, but it was not considered just and right to do it without cause, and dispossession did not often take place, except on the decease of one of the landlords, when changes were oftentimes numerous, and the rights of heirs and tenants comparatively disregarded for the purpose of favoring a new class of persons.

Kanaina testifies that he is about fifty-eight years of age, and that he was acquainted with Kalaimoku, and that he was one of the chief councillors of Kamehameha I. on important matters relating to the Kingdom, and subsequently of Kaahumanu, and that he was next in authority to Kaahumanu. This was during the minority of Kamehameha III. He says, further, in those days the property went to the children. I understand, on the death of a chief, his children became his heirs; if he had no children, it went to the heirs of his brothers and sisters. "It was so in 1827," the year the original agreement was executed. "The King would not refuse when the chiefs met and said, this is the child, or these are the children of the deceased, the King consented, as a matter of course." He says further, "that property was divided as the testator wished it; that the King would distribute it according to the wish of the testators." Dr. Judd, who has been a resident of these Islands since 1828, testifies that there was no positive rule regulating the descent of property, but generally the party claiming to be heir got it.

Judge Andrews testifies : " There was something in practice called common law, in relation to the disposal of property, but that it was not observed." He says, " The children would divide the property, unless some one wanted it, and went to the konohiki and asked for it." He says, " If the heir wanted it, and the chief did not object, he got it." He says, " I do not recollect an instance where the whole of a high chief's property went to his heir, but the heir would get a good portion of it." Some other witnesses testified on the same subject, and I regard them all as confirming the position which the Court have hitherto taken, that the children were regarded as the rightful heirs, liable to be defeated by will, and by persons of superior authority and power ; but in the absence of these, the children

entered into possession, and enjoyed all the rights of the father. Heirs were recognized by the agreement itself ; by the earliest written laws ; and by the principles adopted by the Land Commission. After a thorough examination of many persons perfectly acquainted with the ancient usages of the country, in relation to those who were vested with rights in the lands, the Board refer in terms to the rights of heirs, as well as of tenants.

The analogy of this system of tenure is very striking to that of the feudal system which has prevailed in Europe, the theory of which was that all property in land was originally in the King or chief who governed the country ; that it was granted to his followers for services rendered and to be rendered, but the superior theoretically retained the title in the land itself. There was the lord and vassal, and were similar in relation to each other to that which existed here. The chiefs here gave certain rights and privileges in lands which were granted to them by the King, to chiefs of lower grades, and so in England the tenure was not limited to the paramount lord and vassal, but it extended to those to whom such vassal may have divided his own lands, and they became his vassals ; so that he became a mesne lord between his vassals and the lord paramount. Heirship was a provision in that code. The right of primogeniture was derived from the martial policy of the system. It had, like the system in every country, provisions of inheritance peculiar to itself ; such for example as the total exclusion of females, which is in contrast to the Hawaiian. Chancellor Kent says that " the transmission of property by hereditary descent, from the parent to his children, is the dictate of the natural affections ; and Dr. Taylor holds it to be the general direction of Providence."

Immediately on the death of Kalaimoku, his son, Leleiohoku, by his guardian, designated by his father, claimed the heirship of the property, was recognized as such by the respondent during his life, which was a period of more than twenty years. The heirship was asserted and recognized, and against those rights no claim or interference was made. So far as a single instance aids in the proof of a general usage, this is very strong, from the fact that the respondent was, from time to time, paying the proportion of Kalaimoku's interest for the

L. Keelikolani *v.* James Robinson.

use and occupation of the King's wharf, according to the agreement to his son, who was regarded as the heir. By the evidence given, by the history of the times, and by the resolutions adopted by the Board of Commissioners to quiet land titles, it is very evident that the rights of heirs were disregarded to a greater or less extent, for the purpose of rendering aid to favorites ; but when their inheritance was regarded, and they enjoyed its fruits for a time, which is sufficient to give a title to property by an adverse possession, it would seem to be a late day for a Court, governed by laws regulating descent of property to children, to so far disregard a law based upon principles of natural justice, and defeat a right which, in the darkest days of the feudal system, was held sacred by the King, and earnestly contended for by many of the chiefs of that day.

The Court have already ruled that a party cannot contest the title under which he holds an estate. The same principle applies to the heir when the lessor dies during the term, unless deprived of possession derived from his lessor by a paramount title. In this case it is admitted that the respondent has enjoyed uninterrupted possession of the property, excepting that portion of the original lot taken for the enlargement of the Fort, in lieu of which lot 2 was appropriated and confirmed by the Land Commission. If the claim was for rents and profits of that portion of the King's wharf of which he had been ousted by superior force, the Court would not regard it as valid ; but by the force of the agreement clearly and distinctly made before the Board of Land Commission, by virtue of which, as well as by the original agreement, a valuable award was made, I am of opinion that, for lots No. 1 and 2 as surveyed, and upon which the award was made, the respondent should account to the heir for No. 2 with as much reason as for No. 1. Indeed, so far as the rights of the heir are concerned, it was a clear and distinct recognition of his rights, under the old agreement, and the additional article to said agreement was made with the representative of the heir himself and his mother, who held a life estate in lot No. 2.

It is further claimed that Kalaimoku made a will, and that the King approved it, and that by so doing his property became vested in another than the child of his body.

Kanaina states : " Upon the death of Kalaimoku the chiefs met ; my wife, who was a chiefess, being one, I was present, but not one taking a part. They consulted about the property of Kalaimoku. It was proposed to make over the property of Kalaimoku to the King, but Naihi and Hoapili opposed it, and said, 'we have children of our own,' that is *makou* have children, and then it was decided, and Kaahumanu and Kauikeouli agreed to it, that this property should be made over to Kekauonohi. It was made over to Kekauonohi. This consultation was at an old stone house, in front of the Royal Cemetery, that belonged to Kalaimoku. After the consultation, the chiefs came out and announced what they had decided, and everybody heard it. There were chiefs from Hawaii, Maui and Oahu. Kalaimoku's last sickness occurred during a congress of the chiefs ; that he was lying feeble and expecting to die ; that then a new thought occurred to him. Kaahumanu and Kauikeouli were sitting by him and he thought to *kauoha* them his property, to *hoihoi* it, return it to the King, and that the King should restore it to the child Kekauonohi. I was present at this time and heard what I have stated. Kalaimoku was at the council of the chiefs ; he was lying down sick at the time. Naihi objected, and said ' we have children.' All this matter that I have stated as having occurred after Kalaimoku was dead occurred during his lifetime, but he was sick. The will was discussed before his face in the council, and Naihi said, ' We of our family have children.' (He mau keiki no ka makou.) Kaahumanu and Kauikeouli assented that they should not have the property. Naihi approved it, and the King and Kaahumanu yielded, and it was resolved that it should go to Kekauonohi, according to the first intention."

He further states, in answer to the question if *all* the property went to Kekauonohi : " I will answer, there was some one else, Leleiohoku. Kalaimoku had these two children, Kekauonohi and Leleiohoku ; the property belonged to Kekauonohi ; Leleiohoku was a man under Kekauonohi, just as Kalaimoku was under Kaahumanu. At this council of the chiefs about the

property of Kalaimoku, nothing was said about Leleiohoku having a part of the property. At the death of Kalaimoku, Kekauonohi entered into the possession of the entire estate. At the death of Kalaimoku, Leleiohoku was the only surviving child of his body.

"By the bequest of Kalaimoku, all the property was to go to Kekauonohi, and Leleiohoku was to have none. But he got property—perhaps the half of it, from his sister—such is the ancient custom here, that the sister should provide for the brother and the brother for the sister. This property he got from Kekauonohi, and they lived (*like*) alike on this property, enjoying it in common. The chiefs and the King saw this, and approved of it. They did not do it themselves; but it being done according to the ancient custom, the King and the chiefs approved of it."

At the time of the division, Kekauonohi got the majority of the lands of Kalaimoku. He says further, that Leleiohoku occupied Pakaka, which Robinson has; which is a house lot, and that alone, on Oahu. Kekauonohi occupied the other lands. He says further, that Kekauonohi never, in her lifetime, held or claimed anything in or from Pakaka, and that after Kalaimoku's death, the lands being occupied by Mr. Robinson, Leleiohoku received the profits.

He says: "As I heard and saw, Leleiohoku held this land as the heir of Kalaimoku, and Robinson said Leleiohoku was the heir and son of Kalaimoku. I heard it generally that Kalaimoku had arranged it with Robinson that Leleiohoku was his heir. I heard this from Hawaii when the money was sent for. Haalelea was the man that collected the rents of this land for Leleiohoku."

Kekuanaoa testifies that at the time of the meeting of the chiefs it was not a council. There was nothing said at that time about Kekauonohi's receiving the property of Kalaimoku after Naihi had said "we have children of our own." He further says Kaahumanu gave to Kalaimoku Pakaka. She gave it to him out and out, and without an idea of its being returned. This was not a land, but a house lot; and house lots never paid any tribute to the King, but lands did. Some house lots were given forever, and some were not. That is to say,

this place, Pakaka, was given to his heirs forever. He testifies he heard Kalaimoku say to Boki : "Don't you go and take the money of my child, Leleiohoku, in Pakaka, the land which Robinson has. I heard the King say that it was right that Leleiohoku should get the money from Robinson."

He says: "He was talking to Leleiohoku, Kekauonohi and others, at the time, and heard it. It appeared as if Kekauonohi and Leleiohoku had disputed about it, and as if Kekauonohi had sent herself for the money ; so it appeared, but I had not heard it. The King approved Leleiohoku, and said he was right—that was all."

Haalelea testifies that he lived at Governor Adams' with Leleiohoku ; that he gave him the agreement of Mr. Robinson and Kalaimoku to keep, as he was the "care-taker" of Leleiohoku. He says that he has, on Leleiohoku's order, collected money on said agreement of Robinson, and on one occasion when he had collected $3,000 he gave Kekauonohi $1,000 of it.

He states further : "I have heard Kekauonohi state there was a division of lands between Kekauonohi and her brother. I heard it from them both. It was said in my presence. I heard her say that the King had approved this thing—this business. It was at the house of Kekauonohi, at the time of the mahele of lands."

He further states : "In all my acquaintance with Kekauonohi, and during my marriage with her, I never heard her state that Pakaka was hers. I am her heir under her will. After the death of Kekauonohi, I being her heir, I never thought to claim for myself an interest in Pakaka. The will devised to me every thing, great and small, and did not mention Pakaka."

"Kalaimoku said this child of ours is a child without property. His sister has the property, and this is the kanaka—the man—meaning Leleiohoku, living under her. He pointed to Kuakini, and said Kuakini is the one who will enrich this child. Kekauonohi was not there. When Kalaimoku died, all his lands and the lands of his ancestors came into charge of Leleiohoku, and we lived there. We had the food, and gave it as we wished. Leleiohoku had the disposition of the products of all the lands, and would give to his sister or not, as he pleased ; and many years passed when he did not give her any.

" We understand the mahele to be the division of lands, and not house lots, and at that time I recollect Leleiohoku pointing out the land of Pakaka as his house lot.  The reason I pointed it out to Leleiohoku was that I noticed that in the division between Leleiohoku and Kekauonohi, Pakaka was not put down in either division of shares.  I therefore said : " You have not included Pakaka, neither that lot at Hawaii, reaching from Kailua to Kahaluhe.  Two things have been omitted.'  Leleiohoku replied : ' They have been put in the house lots ; the clerk has written them down.' "

·Kekuanaoa says that he had charge of the land of Pakaka, lot No. 2, as the widow's dower, in her husband's estate ; and Keelikolani said " take our part of Pakaka."

I suppose this part of his testimony has reference to the agreement made before the Land Commission.

It appears that Kuakini and others who had charge of Leleiohoku in his youth, held this agreement with Robinson, and collected money by virtue of it ; that he was regarded by Robinson as the legitimate heir of the property, and that Kekauonohi never claimed in her lifetime anything in Pakaka, and no claim has ever been made by her heirs to said estate.  Even at this distance of time, in giving testimony of a will, there is great uncertainty as to the accuracy of the statement.  But even admitting that Kalaimoku gave his estate to Kekauonohi, with Leleiohoku as his kanaka (meaning thereby one who should participate in it—who had rights in it), it is very evident that it was not the intention that the entire estate should be hers. Pakaka is clearly an exception.  Had it been included in the will, would she not have taken possession of it, it being always valuable and productive ?  It is somewhat singular that neither Kekauonohi, during her life, nor her heirs, since her death, have made claim, that at this late day, when it is difficult to be satisfied of the exact intentions of the testator by any other means than the conduct of the devisees and heirs themselves, that this respondent should seek to defeat the rights of those whom he has recognized for about thirty-four years, as the rightful heirs of the party with whom he made the original agreement ?  As the testimony stands, a Court of Probate could not approve this will, for no Court would sustain a claim against a legitimate

heir, when he had been in possession of the property from his father's death—especially for this long period—without some explicit intention of the testator to disinherit his child in specific property, which the heirs have enjoyed from the day of his death.

The heir was an infant; the agreement was placed in the hands of his guardian; the alleged devisee of Kalaimoku assuming no claim at the time, nor during his life, nor at his death, when the property was claimed by the heir of the son of Kalaimoku. Had the will included this property, it would have been understood at the time, for wills made by word of mouth usually have a construction at the time; and it is somewhat difficult to enlarge their terms afterwards. What was done by the parties interested, on the death of the testator, and mutually acquiesced in for a long period of time, is the best evidence that they are carrying out the intentions of the testator. And it would be very hazardous, at this late day, to set up new titles, and especially to give the benefit of them to strangers against a rightful heir.

It is in evidence that Kalaimoku died in October of the same year in which the agreement was made, and Mr. Robinson was living on the premises. He admits that he recognized Leleiohoku as the heir; and it is in evidence that he paid his money under the agreement. Had there been any pretence that this was not a legitimate title—that there was a devise of the property to another—it would have probably been made known. Whatever the terms of the will may have been, and whatever ancient usages may have governed their construction, it is evident that Pakaka could not have come within the purview of those terms, so far as we are enabled to judge by the conduct of the parties interested, or by the evidence which has been adduced in the case.

I have examined this question more than I have regarded it necessary, as the counsel elaborated it with so much labor and ability, for my own view is that the respondent cannot question the title under which he holds by virtue of the contract, nor the title of the heir to the party to that contract, until he has been deprived of possession derived from him by a paramount title.

L. Keelikolani v. James Robinson.

The respondent originally obtained possession, and has been permitted to hold it by virtue of the original agreement with Kalaimoku, sanctioned by his heirs as well as by the award of the Board of Land Commission, obtained by virtue of said agreement, and the policy of the law will not allow him, under these circumstances, to be guilty of a breach of good faith in denying the title. It is well settled in England and in the United States, that a tenant can neither deny his landlord's title in ejectment, nor set up an outstanding or paramount title in himself or a third person. This principle applies not only to the original parties to the lease, but applies to all who claim under the tenant; or take by descent or purchase from the landlord. (2 Smith's leading cases, 57, 658, and cases therein cited.) If any one has a title to this property by will, or by any other claim, let him show it, for it is not legitimate for one party to defeat the payment on an agreement of this character by setting up an adverse title. The heir holds, unless the property is devised by will, and until the will is proved. In this case the will has not been proved according to the ancient usages, for the alleged devisee declared in her lifetime that she never did claim Pakaka.

In any view which can be had of it, no such adverse claim has been made out, as to interfere with the rights of the heirs. The heir holds till the paramount title is made out. There is no pretence that the respondent can suffer by making the payment under the agreement, from any claim which could be presented by the heirs of Kekauonohi; for it is in evidence by her sole heir, that she never made any claim during her life, and that he has not since her death, and that they knew that Leleiohoku was receiving the profits arising under the contract, and approved of the same; and that the money was sometimes collected by Haalelea; and that since his wife's death he has made no claim for the rents and profits. Whatever rights they may have, they cannot be asserted to the injury of the respondent, so far as an account and payment on this bill is concerned.

It is admitted that Leleiohoku was lawfully married to the complainant, and that he died intestate in 1848, leaving a son named John Pitt Kinau; and I regard it as proved that he was his only child, and therefore by law was his sole heir.

But it is contended that by the law of 1839, the King would take one-third of the lands of the estate on Oahu, and if notice was not given in two months to the King, then he would take one-half; and as no notice has been proved, the Court cannot say what lands John Pitt Kinau did inherit. I do not regard it necessary to give an opinion of the rights of the King, by virtue of the law referred to, for it is sufficient for the decision of the present case, for the complainant to prove that John Pitt Kinau was the only heir of Leleiohoku, and that he inherited this property; and if there was any omission or neglect to give to the King his portion of the lands, it cannot defeat the present bill, nor enure to the benefit of the respondent. Before he can avail himself of any advantages of an omission in the assertion of the rights of His Majesty, or any one else, he must be ousted by the paramount title. When this is done it will be a legal defense to any suit to account; but this is not the occasion to try that question.

The law, in its terms, refers to certain lands which descend to heirs, and it is very doubtful whether the reference is to lots like Pakaka; but if it was, the inheritance is complete, and is only liable to be defeated in part of the lands so inherited. It would be a new principle of legal adjudication, for the Court to pass judgment on the rights of parties, strangers to the suit, and upon which no decision had been made upon the subject matter; and hence the principle of law so fully recognized that a party cannot controvert the title under which he holds an estate; and the same principle applies to the heir, unless deprived of possession, derived from his lessor, by a paramount title. The principle applies with equal force to the claim set up for Kalama, the Queen Dowager, which it is alleged she has by virtue of the grant and award of a land called Waikahalulu—Pakaka being included within its bounds. It is not pretended that the respondent has suffered any interference of his possessory rights by virtue of this claim.

The counsel have labored with great assiduity, and have exercised more than usual ingenuity in their efforts to sustain the claims of others to Pakaka, than the parties to the original agreement and their heirs, which includes the respondent as one of the original parties, and the complainant as the heir of

the *other;* and it is especially remarkable, as the parties themselves have neglected to make any claim, and especially in the case of Kekauonohi, who fully admitted the rights of the son and heir of Kalaimoku during her life ; and now comes Haalelea, her husband, and says, being her heir : " I never thought to claim for myself an interest in Pakaka." More than thirty-four years have passed since Kalaimoku's death, and Kekauonohi and the heir of her estate never entertained the idea of asserting an interest in Pakaka.

The counsel for the respondent contends further that if the complainant is by operation of law the heir of Kalaimoku's estate, that he is not obliged by the pleadings and proofs as they stand to account for the use and occupation of only that portion included in the agreement, being lot No. 1.

It is alleged in the bill that the true intent and meaning of the said agreement is, that the said Kalaimoku shall receive one-half of all the proceeds of the said premises, whether the said proceeds may arise from rents, wharfage, or the use of the said premises as a ship-yard, the said Robinson being, at the date of the said agreement, and at all times since, a shipwright, after deducting one-half of the expense of altering, repairing or improving the wharf ; and the respondent by his answer admits that he did present to the Board of Commissioners to quiet land titles a claim for his rights and interest in and to the entire premises described in the said written instrument, and that the said Board made an award upon the said claim, and avers that thereto attached, and marked A, is a full and exact copy of all the proceedings before the said Board upon the said claim, together with the award thereupon, and that he has never become a party to any agreement with Kalaimoku, or his heirs and assigns, in relation to the premises described in the within instrument, executed by Kalaimoku and the defendant, other than the one set forth in the complainant's bill, and dated 11th day of January, 1827.

Mr. Ii testified that Mr. Robinson, the present respondent, appeared before the Land Commission, and presented the agreement between himself and Kalaimoku. I know that Gov. Kekuanaoa acted in the matter after the death of Leleiohoku, and represented the interest of Keelikolani, the present complain-

ant, and I represented the child's, Kinau. He said that he con-
versed with Robinson in relation to the matter, and Robinson
said, " how about this, that I should have the upper piece, just
as I have the lower piece," and I said, " that is with Kekuanaoa
and you," and Robinson replied " that he had so arranged it."
Subsequently Robinson entered into possession of that part
above the wall, and built a store-house, and has occupied it up
to the present time.

· The claim of Mr. Robinson, as it appears, was for a lot com-
monly called the "Point," based upon the agreement with Ka-
laimoku, and the Board recognized its genuineness, but the
claimant alleged an infraction of said agreement and claimed an
equivalent, and after the matter was satisfactorily arranged by
both parties, the representative of the heirs of the grantor, M.
Kekuanaoa, with the consent of the Hawaiian Government, con-
sented that another piece of ground should be added to the
original lot, and not formerly included in it, in lieu of the por-
tion taken away, and accordingly the claimant was confirmed in
the same rights and privileges in the lot commonly called the
" Point," and now including the additional piece under Part
No. 2, as described by special survey as lots Nos. 1 and 2, as
were granted in the original agreement, and subject to the same
rules and conditions as are therein contained, the entire instru-
ment as quoted being now confirmed by the Board in full appli-
cation to the present claim. It is very evident that the claim-
ant desired lot 2, as an equivalent for what had been taken, and
that Kekuanaoa, as agent of the heirs, acquiesced in it. It is
equally clear that the guardian acquiesced in it, for it is for the
benefit of the ward equally with Robinson.

The mother of the ward surrendered her life estate in said
lot for the purpose of having the agreement of Kalaimoku and
Robinson carried out. Robinson acquiesced in it by entering
upon the possession on the terms and conditions of the original
agreement. The complainant acquiesces in it by calling upon
the party to the original agreement to account. It was upon
the original agreement that the award to Robinson was based
in lot No. 1, and upon the rights of the heirs of Kalaimoku
also in lot No. 2 that the award was based to claimant. It was
an effort to carry out the original agreement in good faith. It

L. Keelikolani *v.* James Robinson.

is contended that the Land Commission could not grant away the land of the heirs of Kalaimoku upon any terms. This is true. Their duty was to decide upon the claims of parties to lands, and confirm them in their rights. Robinson put in his claim to the Point based on the agreement referred to, and complained that a portion had been taken. And the heirs virtually said, in order that your rights may be fully confirmed, another piece shall be added in lieu thereof.

It is further contended that the Board could not impose a covenant upon the defendant to accept the grant upon terms to which he did not agree. As I have said before, I do not regard it a grant, but an award of the rights of the claimant. Neither will the doctrine be controverted that the Board could not impose a covenant to accept the award; but when it appears that he sought an equivalent for the portion taken, and received as such lot No. 2, and immediately went into possession of it, and has been from that time receiving the benefit of its occupation—holding it under the terms and conditions of the original agreement—it seems to be but an equitable fulfillment of the agreement that he should account; for it is very clear that the award was made on terms mutually agreed upon by the parties as well as upon their rights to the lots in question.

The award of the Land Commission to the respondent is peculiar in this, that it confirms him, his heirs, executors, administrators and assigns in the same rights and privileges, and subject to the same rules and conditions as are contained in the agreement of Kalaimoku and said Robinson, the claimant. The award, in the usual form, merely confirms the claimant's title for the land. In this case it is confirmed subject to certain rights and privileges, and to certain rules and conditions contained in an agreement made by the claimant with the original holder of the land.

The Court regard a Land Commission award as final. (1 Haw. Rep., Kekiekie *vs.* Dennis, 42 ; Kukiiahu *vs.* Gill.,54.) If, then, it gives a title, how far will it inure by its terms to the benefit of the complainant, it having been taken in the name of the present respondent and the claimant before the Board ? I regard the award as made for the benefit of the parties inter-

ested in lot No. 1 by the original agreement, and in lot No. 2, by the agreement made before the Land Commission, and upon which the award was based. The award confirms the rights of the parties in these lots, and the respondent holds them subject to the terms and conditions of the original agreement, and upon which agreement he is legally and equitably bound to account to the complainant.

---

An appeal having been taken to the full Court from the foregoing decision of the Chancellor, Justice ROBERTSON delivered the judgment of the Court as follows :

It appears that on the 11th day of January, 1827, the late high Chief Kalaimoku, and the respondent, Mr. James Robinson, entered into a written agreement, under seal, which reads as follows, viz :

" Know all men by these presents, that I, Karaimoku, commonly called William Pitt, Esquire, do hereby assign unto James Robinson, his heirs, executors, administrators and assigns, one half of the wharf commonly called the King's Wharf, situated near the southwest angle of the Fort, in Honolulu, extending in front one hundred yards or thereabout, and running back one hundred yards or thereabout, on the following conditions :

" First—The said James Robinson doth hereby bind himself, his heirs, executors, administrators and assigns, to pay one half of all the expenses incurred in altering, repairing or improving the said wharf, and to pay to Karaimoku, his heirs, executors, administrators and assigns, one half of all the monies received for the use of the said wharf and premises ; and I, Karaimoku, do hereby agree to pay one half of all the expenses incurred in altering, repairing and improving the said wharf, and we do hereby bind ourselves, our heirs, executors, administrators and assigns, to fulfill the above agreement.

" Given under our respective hands and seals, at Honolulu, this 11th day of January, in the year of our Lord, 1827.

(Signed)　　　　　" KARAIMOKU,　　[L. S.]
　　　　" ,　　　　　" JAMES ROBINSON, [L. S.]
" Witness :
　　　" FRANCISCO DE PAULO MARIN."

L. Keelikolani *v.* James Robinson.

About the time the foregoing deed was executed, and in pursuance thereof, the respondent entered into possession of the entire premises therein described, and he has ever since continued to occupy and use said premises, with the exception of a part thereof taken possession of by the Government a few years after the date of the deed, and in lieu of which, it is alleged by the complainant, an addition was made to the original premises in the year 1851, of an adjoining piece of land, not embraced in the above deed, which the respondent has occupied and used since that date.

It is admitted that the respondent has received rents and profits, to a large amount, from the use and occupancy of the premises described in the deed, and also from that afterwards added; and it appears he has, at divers times, made payments of sums of money, to those who claimed to be the legal representatives of Kalaimoku, on account of their shares under the agreement, but that no final accounting or settlement has at any time been made by the respondent. The complainant, therefore, setting up in her bill that she is now the lawful representative of Kalaimoku, prays that the respondent may be required to account to her, as the party entitled to a share of the rents and profits.

It appears that Kalaimoku died, on the island of Hawaii, about the month of October, 1827, and it is alleged that he left as his only son and heir, the late Gov. William Pitt Leleiohoku, who died in the year 1848, leaving, it is alleged, as his only son and heir, the late John Pitt Kinau, who died in the year 1859, being still a minor and without issue, and whose estate, it is admitted, was inherited by his mother, the complainant, as his heir at law.

At a former stage of the cause, it was decided by the Court that the respondent could not be permitted to dispute the title of Kalaimoku to the land in question; but, as I took occasion to say, when ruling upon the first demurrer, the respondent may well dispute, in my opinion, the right of any other party claiming an account of rents and profits, as the inheritor of Kalaimoku's interest in the land, and of his rights under the agreement of 1827. By that agreement Kalaimoku conveyed to Mr. Robinson an undivided half of the land, and created a

tenancy in common in the premises, the estate of the respond-
ent, however, being, perhaps, defeasible.   It is quite possible
that to-day the estate of Kalaimoku, including the right of
reverter in that granted to Mr. Robinson, if his title is defea-
sible, might be the property of one person, while the present
enjoyment of the share of rents and profits, under the agree-
ment, might be the property of another.   It seems to us,
therefore, that two questions arise under this branch of the
case, as presented by the pleadings, viz : Is the complainant
the inheritor of the estate of Kalaimoku in the premises in
question ? and is she the party presently entitled to a share of
the rents and profits ?   The last question seems to us even
more important than the first, for as there is no privity of
estate between the parties as tenants in common, (Blackstone's
Com., book 2, chap. 12 ; Kent's Com., vol. 4, p. 385), it is by
reason of the privity of contract that the respondent is bound
to account to whoever is the lawful representative of Kalai-
moku.   If the complainant has made out a sufficient *prima
facie* case in favor of her being now the tenant in common of
respondent, and as such entitled to share in the profits, the
burden is thrown upon the respondent to rebut complainant's
claim, and if he fails in doing so, she must take a decree against
him for an account.

At the hearing, respondent admitted it to be clearly proven
that William Pitt Leleiohoku was the son, and, so far as appears,
the only child of Kalaimoku, but contended that the fact of his
being such did not necessarily make him the heir of his father's
property, inasmuch as at the time of Kalaimoku's death there
was no fixed or uniform law of inheritance in this Kingdom, by
force of which a son inherited, of course, as heir of his father.
A considerable amount of valuable testimony has been presented
touching this point, and upon a careful review thereof, we are
of opinion that the respondent is right in his position, and that
in the year 1827 there was no fixed or uniform law of inher-
itance in the Kingdom, such as has existed here for the last
twelve or fifteen years.   At the same time, however, it seems
abundantly clear that among the higher class of chiefs at least,
the possession and use of lands usually descended from one set
or generation of holders to another.   That is to say, upon the

death of a landholder the possession of his lands was not ordinarily resumed or appropriated by the King. The fact of a general transmission of the possession of lands seems well established, although such transmission was not governed by well defined rules or uniform custom.

This brings us to the next point, for it is contended by the complainant that, as a matter of fact, Leleiohoku did inherit his father's interest in the premises occupied by the respondent; while on the other hand, it is contended that Kalaimoku, shortly before his death, made a verbal will, bequeathing his entire property to his niece, the late female chief, Miriam Kekauonohi. Kekauonohi, although only what we call a cousin of Leleiohoku, was regarded, according to ancient Hawaiian ideas, as his sister, and it appears that Kalaimoku, in making a verbal disposition of his property, expressed his will that his lands should pass to Kekauonohi, who was older than Leleiohoku, and that Leleiohoku should be the *kanaka* living under her. Accordingly, it seems that subsequent to the death of Kalaimoku, Kekauonohi was regarded as having inherited his lands, but Leleiohoku participated with her in the enjoyment of their usufruct, and when the Great Division of 1848 arrived, Kekauonohi and Leleiohoku made a private division of the lands inherited from Kalaimoku, previous to presenting themselves before the King as *konohikis.*

It seems clear, too, that the wharf lot which forms the subject of this controversy, never was looked upon as standing in the same light with the other property of Kalaimoku. It was treated as a specialty from the beginning. Even before his death, Kalaimoku cautioned his turbulent rival Boki, in the presence of others, to abstain from interfering with the money to be derived from his agreement with Mr. Robinson, which he spoke of as belonging to his son Leleiohoku. It does not appear that the agreement ever came into the possession of Kekauonohi, but was carried to Hawaii by Kalaimoku, who gave it to Governor Kuakini, in whose charge also he left his son. Kuakini, after the death of Kalaimoku, confided the keeping of the deed to Levi Haalelea, who occupied the relation of a *kahu* to Leleiohoku, telling him it was the property of the child, and subsequently, when Leleiohoku sent Haalelea to ask for money

L. Keelikolani *v.* James Robinson.

from Kuakini, he replied that he had already given him money, or its equivalent, by giving him the deed. There can be no doubt that Leleiohoku was recognized by the late King as the inheritor of Kalaimoku's interest in the wharf premises, and entitled to the moneys accruing under the agreement. Upon one occasion Kekauonohi received, with Leleiohoku's consent, a portion of a large sum of money paid by respondent upon an order from Leleiohoku, but there is no evidence to show that Kekauonohi ever considered herself as heir to the property in question, or its profits. She presented no claim to the wharf lot before the Land Commission, nor did she ever set up any title to it as against the heir of Leleiohoku, after his death, and Mr. Haalelea, her sole legatee, states that this property is not included in her estate as devised to him. Further, it is alleged and admitted that Leleiohoku was always recognized by the respondent as heir of his father's rights under the agreement. It is true, as contended, that respondent might have recognized Leleiohoku and made payments to him as heir, through mistake, and the fact that he had done so should not prejudice him now, or be held to bind him to continue paying a share of the profits to a party not legally entitled to demand it. But the fact that Leleiohoku was recognized by the respondent, in common with other interested parties, for a great many years, taken in connection with all the circumstances attending this branch of the case, affords evidence irresistibly strong in favor of Leleiohoku being the heir. There can be no doubt, it seems to us, that whatever other property Kekauonohi may have inherited from Kalaimoku, she never inherited his rights in Pakaka.

It is contended further, on the part of the respondent, that it is not clear that John Pitt Kinau inherited his father's rights in this property and contract, inasmuch as it does not appear that at the death of Leleiohoku in the year 1848, a compliance was made with the law of 7th June, 1839, respecting the descent of lands to heirs. (Old Laws, page 47, Sec. 14.) The law referred to enacted, in relation to lands which had been given to land agents (konohikis) by Kamehameha 1st and Kamehameha 2d, that upon the death of any konohiki, his heir should render an account of the lands held by the deceased, and restore one-third of them to the King ; and that if the heir suffered two months

to elapse without presenting himself, or sending a written notice, he would be required to give up one-half of his ancestor's lands. No compliance with the requirements of this law having been proven, it is argued that the Court cannot be aware what portion of Leleiohoku's lands were inherited by his son, and he may not have inherited Pakaka.

This objection is met in several ways. In the first place, as a matter of fact, it appears by the documents filed in Probate Court, during the settlement of Leleiohoku's estate, that Pakaka was included in the enumeration of his property, as presented before the Court and acted upon by the guardian of the heir and the widow, in the adjustment of the widow's dower, and there is no evidence whatever that Pakaka, or any other part of Leleiohoku's property, was claimed or resumed by the King. Indeed, in view of one of the provisions of the law of 1839, admitting that law to have been in force at the time of Leleiohoku's death, his heir was not obliged to restore any part of the lands held by his father. That provision, which was not adverted to during the argument, is to the effect that if the heir of the konohiki was his own child, he should not be required to restore one third of his ancestor's lands to the King, unless such heir had previously been enriched by being heir to some other Chief. This seems to us of itself a sufficient answer to the objection ; for, if necessary, we think the Court, under the circumstances of this case, would feel bound to presume, until the contrary was shown, that if any such formality was requisite as that contended for, it had been complied with.

But it is cogently urged on the part of complainant, that the law of 7th June, 1839, was not in force at the time of Leleiohoku's death in 1848. This argument seems to us entitled to great weight, for while it is true that the chapter of the old laws which contains the enactment referred to, had not been expressly repealed by name in 1848, it is evident that some of the provisions of the second and third Acts of Kamehameha III. are entirely inconsistent with the tenor of that enactment. As early as 1846 provision was made for the establishment of judicial tribunals of general jurisdiction, whose powers included among other things, the functions of a Court of Probate ; hence it is argued that, upon the passage of the second Act of

L. Keelikolani *v.* James Robinson.

Kamehameha III. it was plainly the intention of the King and Legislature to vest in the Courts the exercise of all the functions of a judicial character appertaining to this subject, which had previously been exercised by the King, the Premier or the Governors. In the Act to organize the Judiciary Department (third Act of Kamehameha III.) passed in 1847, in which provision is made for the settling up of the estates of persons dying possessed of property, whether testate or intestate, nothing whatever is said of reporting the death of a landholder or the names of the lands held by him, to the King or Premier, nor has any evidence been adduced to show that such formality has ever been deemed necessary since the passage of the organic Acts.

Further, the institution, in 1846, of a tribunal invested with the powers conferred upon the Board of Commissioners to quiet land titles, with the avowed intention of separating the previously undivided rights of the King, Chiefs and Makaainanas, and of putting an end to the ancient system of land tenures, was wholly inconsistent with the retention, on the part of the King, of the right to resume any portion of the lands held by a konohiki upon the occurrence of his death. Such right could no longer exist. The titles awarded by the Board were free of all burdens except that affecting certain classes of them, which were subject to the payment of a commutation to the Government, to render them allodial. Had the Board succeeded in completing its work within the period of two years originally allowed for the purpose, Leleiohoku would have had an award for his lands before he died, securing them to him in their entirety, either by name or by metes and bounds. Again, the great division of lands between the King and the konohikis took place in February, 1848, some time before Leleiohoku's death, and the lands then granted to him by the King were so granted without reservation of any kind upon the part of His Majesty. In short, the establishment of the Land Commission, by the King, and the division of 1848, were, in our opinion, so clearly a repeal of the provision relied on in the law of 1839, that express words for that purpose would have seemed superfluous.

The last and perhaps the most obviously conclusive argument

urged against the objection raised by the respondent, under the law of 1839, is this : That said law, like the division of 1848, had no application to that species of landed property which formed the subject matter of the agreement between Kalaimoku and the respondent.   We regard this argument as sound beyond question.   The following remarks occur in the " Principles adopted by the Board of Commissioners to quiet Land Titles."   (See vol. 2 Statute Laws, page 84.)   " But between the ownership of lands for cultivation and mere building lots, there are often broad lines of distinction.   Mere building lots were never bestowed by the King or Lords for the purpose of being given out to tenants, as was uniformly the case with the lands suitable for cultivation.   It follows, therefore, that (with some exceptions, which in all cases must be proved) in relation to building lots, there is no third class of persons having the rights of lords over tenants.   The exceptions would be in those cases where individuals having received building lots from the King for their own particular use, those individuals have themselves, for some consideration expressed or implied, transferred such lots to third parties."   We may remark in passing, that this case is not within the exception, nor is the relation of Kalaimoku's representatives to the respondent that of a lord over a tenant, but, so far as concerns this Court, of one co-tenant towards another.   Kalaimoku did not transfer the entire lot to Mr. Robinson, but granted him an estate in it in common with himself.   Governor Kekuanaoa, in his testimony, when speaking of the gift of Pakaka by Kaahumanu to Kalaimoku, says : " This was not a land but a house lot, and house lots never paid any tribute to the King, but lands did. Some house lots were given forever, and some not.   That is the way that place (Pakaka) was given—to his heirs forever." Lastly, the language used in the law of 1839 is incompatible with the notion of its applicability to such lots.   The Act speaks of *na aina* of the konohikis, narrowly translated in the English version as farms, given to the land agent.   The language of either version, as well as the whole tenor of the law itself, excludes the idea of its application to town lots or wharf lots.

After what has been said, there can be no doubt that John Pitt inherited his father's rights in Pakaka, and as it is admitted

that complainant inherited the rights of her son, the first question we proposed is satisfactorily answered in favor of complainant.    Let us proceed to examine the second.

Having enforced the last argument, derived from the peculiar nature of the property involved, as against the position taken by the respondent under the law of 1839, we will now endeavor to show that the same line of argument is equally conclusive as against the next point made by the defense.    It appears that in the division of 1848 the land called "Waikahalulu," within the ancient boundaries of which Pakaka is situated, was granted by the King to Queen Kalama, and her title was subsequently further perfected.    Under the general rule that the party holding an award or patent for an ahupuaa is the owner of all the land embraced within its boundaries, except such portions of it as have been awarded by the Land Commission to other persons, it is contended by counsel for the respondent, that unless the complainant has shown that Pakaka was awarded by the Land Commission to Leleiohoku or Pitt Kinau, the fee of that lot has become vested in the Queen Dowager as a part of Waikahalulu, and that in consequence she, and not the complainant, is now the owner of the rights formerly possessed by Kalaimoku and Leleiohoku.    This argument would be entitled to weight if the rule relied upon could be held to apply in this case ; but we must hold the reverse.    In our opinion upon the grant of Pakaka to Kalaimoku by Kaahumanu, which was the same as a grant from the King, it ceased forever to form a part of Waikahalulu as held by the konohiki.    Pakaka, part of which was known as the King's wharf, thenceforward became, like many other town lots situated within the natural boundaries of Waikahalulu, a portion of a new class of real property which was not covered by the law of 1839, the Great Division, nor the rules affecting the ordinary *kuleanas*.    A part of the remarks already quoted from the Principles of the Land Commission, may be cited here again : "It follows, therefore, that (with some exceptions, which in all cases must be proved) in relation to building lots, there is no third class of persons having the rights of lords over tenants."    The Queen Dowager, in her capacity of konohiki of Waikahalulu, could not have been recognized as a counter claimant for Pakaka before the Board.    If such a lot escheats

L. Keelikolani *v.* James Robinson.

for want of heirs, it escheats to the State, and not to the ancient konohiki. The commutation payable upon town lots awarded by the common freehold titles, is payable to the Government, and not to the lord of the ahupuaa. In our opinion, if to-day the title which Kalaimoku formerly possessed in Pakaka is not legally vested in his heirs, it might be recovered by the Hawaiian Government, but never by the lord of Waikahalulu.

At the hearing, counsel for the respondent did argue before the Court, that the heirs of Kalaimoku had not entered their claim, and obtained an award from the Land Commission for a title to Pakaka, and that therefore they had lost their rights, by virtue of the statute barring all claims not presented within the time allowed for that purpose. In other words, that the Court is bound to take notice, that the rights of Kalaimoku's heirs have become forfeited to the Government by operation of law, and that the Government is now tenant in common with the respondent. But it appears to us, as contended on behalf of complainant, that the Court cannot proceed upon this assumption. The Hawaiian Government is not and could not become a party to this suit, nor does it appear that the Government has ever instituted any proceedings to enforce a claim to Pakaka as against the heirs of Kalaimoku. Had the Government done so successfully, then, in our opinion, the respondent might with propriety and success have plead its recovery, as a complete bar to the complainant's suit. But, as we remarked at a former stage of the cause, the *title* to the land is not put in issue by the pleadings in this suit; and, as we have said above, if the respondent is bound to account to the present complainant, it is not by reason of privity of estate between them, but by reason of privity of contract, under the agreement of 1827.

It appears by the evidence that Leleiohoku did present a claim for a title to Pakaka before the Land Commission, but his claim does not appear to have been directly adjudicated, nor was any award issued thereon, either to him or to John Pitt Kinau; while Mr. Robinson also presented a claim upon which the title was formally adjudicated, and an award issued to him. But it would seem to us out of order for the Court in this suit, because of the reasons in law which we have just stated, to enter upon an examination and decision of the interesting ques-

tion, as to how far the award obtained by the respondent, whose possession was that also of the other tenant in common (Thomas Coke's 1st Inst., Vol. 1, page 758 ; Kent's Com. 4, page 387), ought to be regarded as an award also upon the title of his co-tenant, Leleiohoku, and as enuring, in equity, to the benefit of the heirs of Kalaimoku ; for the Court will not, although asked to do so, decide in advance questions which are not fairly or necessarily in issue in determining the rights of the only parties now before it. We do not hesitate to say, however, that as Leleiohoku does not appear to us to have been guilty of con-tumacy, the way seems fairly open for an application, on the part of the complainant as the representative of Kalaimoku, to the Government, for a fee simple patent, based upon the award made in favor of her co-tenant and bailiff, to be issued on pay-ment of the usual commutation, which, if obtained, would set the matter at rest.

In our opinion, the complainant, so far as now appears, is the only party entitled to a share of the usufruct with the respond-ent, and must therefore take a decree against him for an ac-count.

But it is contended by counsel for the respondent that, if the Court shall decree against him, he is only bound to account for the profits arising from that portion of Pakaka designated as Part 1 in the Land Commission award. It appears that several years after the date of the grant by Kalaimoku to Mr. Robin-son, the Government took possession of a part of the lot com-prised in the agreement for the purpose of enlarging or improv-ing the fort, and that the part so taken away was never restored to the possession of respondent. When he presented his claim before the Land Commission, as appears by the recital in the award, he demanded an equivalent for what had been taken from him ; and as the widow and heir of Leleiohoku were the owners of the adjoining portion of Pakaka, now designated as Part 2, an adjustment was arrived at, after considerable delay, by their consenting, through Governor Kekuanaoa, with the approval of the Government, to add Part 2 to Part 1, so as to include both in the award and survey to be delivered by the Board to Mr. Robinson. An award was issued in accordance with that adjustment, declaring the grant made by Kalaimoku

to include within its limits all the land described as Part 1 and Part 2, which award was accepted by the respondent, who has ever since held possession of the additional piece of ground, deriving profits from its occupation. Counsel argues first, that the tenancy in common in the land, called Part 2, was not conveyed to the respondent by the heirs of Kalaimoku, but by the Land Commission, for the King, in lieu of the alleged deprivation. He then goes on to argue that the Board had no authority to grant away the land of the heirs of Kalaimoku upon any terms, and that it does not appear they had attempted to do so; and if they had done so, they could not have imposed a covenant upon the respondent to accept the grant upon terms to which he did not agree. The unsoundness of this argument seems to us no less apparent than its inconsistency. It might be answered briefly by saying that the Land Commission, with the powers of a Court of Record, was competent to judge of its own authority, and whatever it did was final, unless reversed or modified by the Supreme Court upon appeal. But there is another answer : It is true that the Land Commission had no power to grant away the land of Kalaimoku or his heirs to the respondent. Had the parties appeared as counter claimants to Part 2, the Board ·could have declared to which of them it belonged ; or had there been a dispute as to the boundary line between Part 1 and Part 2, the Board could have decided that. In this case the question was as to how much land should be included as covered by the agreement of 1827, in view of the alleged deprivation, and the Board; with the consent of the parties interested, settled the question by adding Part 2 to the land previously occupied by the respondent, and thereupon issued an award in accordance with one of its standing rules, which, in cases of a title based upon a written grant, required the award to be made in strict conformity with the terms and conditions of such grant. (Vol. 2 Statute Laws, page 92, subdivision 4.) The respondent claimed that Part 2 should be included in his grant; his claim was acceded to, and he accepted an award for the whole, to be held pursuant to the conditions expressed in the agreement of 1827, under which he had made his claim. No new covenant was thrust upon him. But it is said no written grant has been shown from the representatives of

Kalaimoku to Mr. Robinson, of the land called Part 2. In our opinion none was requisite. We are not aware of any statute of the Kingdom, in existence at the time, which rendered void a verbal conveyance of an estate or interest in land, as between the parties to it ; and besides that, the objection, if valid, could be obviated even now, under the direction of the Court. Again, this is not a suit for the specific performance of an agreement to convey lands, but a suit to enforce the performance of a covenant annexed to a conveyance which has been executed by the delivery of possession.

For these reasons we are clearly of opinion that the decision of the Chancellor should be affirmed, and the respondent decreed to account, as bailiff of the complainant, his co-tenant, for her share of the usufruct of Part 1, from the date of the grant by Kalaimoku, and for that part of Part 2, from the date of the Land Commission Award.

In accordance with the decision of the Chancellor, and in conformity with the practice of this Court, complainant's counsel presented the draft of an order requiring the respondent to account, framed in conformity to the prayer of complainant's bill. Respondent's counsel saw fit to permit the order to be granted by the Chancellor, without their appearing to offer objections, or to show cause against it ; but at the hearing before the full Court, they took exception to the order on the ground of its being broader in its terms than the agreement of 1827, as they construe it. We have, therefore, after considering the arguments of counsel, determined to supercede that order, and to issue in lieu thereof, an order couched in the precise language of the said agreement, requiring the respondent to account for " all the moneys received for the use of the said wharf and premises," so as to afford Mr. Robinson an opportunity to account, in the first instance, upon his own conscience, his own understanding of his agreement with Kalaimoku, and his own sense of right. When the respondent shall have so accounted, if his account should not prove satisfactory to the complainant, we will then hear the parties further. The fresh order has been prepared under the direction of the Court, and will be appended to this judgment.

Messrs. Harris and Davis for complainant.

Messrs. Bates and Montgomery for respondent. [July, 1862.