IN THE MATTER OF THE BOUNDARY OF SECTIONS TWO AND THREE OF KAHUA 2 IN THE DISTRICT OF SOUTH HILO, ISLAND OF HAWAII.

APPEAL FROM COMMISSIONER OF BOUNDARIES, FOURTH CIRCUIT.

ARGUED NOVEMBER 14, 15, 16, 17, 1910.    DECIDED DECEMBER 2, 1910.

HARTWELL, C.J., PERRY AND DE BOLT, JJ.

APPEAL AND ERROR—*right of appeal from decision of boundary commissioner.*

At the hearing of a petition for the determination of the boundaries of certain land the Territory of Hawaii appeared and contested the boundaries as claimed by the petitioner. The issue of fact was tried at length, the parties producing, at considerable expense, all of the evidence known to them. Nearly four years later the commissioner filed his decision dismissing the petition "without prejudice, at the petitioner's costs," on the ground of failure of proof of petitioner's title to the land the boundaries of which were sought to be adjudicated. Held, that the Territory was aggrieved and had the right of appeal from the decision.

DISMISSAL AND NON-SUIT—*proof of title in boundary case.*

In the petition, the applicant alleged title in itself. This allegation was not disputed and the trial was conducted on the theory that the applicant had title. Under these circumstances

the commissioner may not, of his own accord and without giving opportunity to the parties to cure the supposed defect, dismiss the petition on the ground of failure of proof of title.

APPEAL AND ERROR—*boundaries—newly discovered evidence.*

In the supreme court, on appeal from a boundary commissioner, additional evidence may be admitted even though strictly not "newly discovered" within the meaning of the law applicable to motions for new trials in ordinary cases.

BOUNDARIES—*finding on the evidence.*

Upon the evidence in this case the westerly or mauka boundary of the ahupuaa of Kahua 2 in the district of South Hilo, Hawaii, is held to be at a point called Kananaka and not at a point called Huinawai or Nahuina.

OPINION OF THE COURT BY PERRY, J.

This is an appeal from a decision of the commissioner of boundaries for the fourth judicial circuit upon the petition of the Pepeekeo Sugar Co., a corporation, filed on April 23, 1906, for the determination of the boundaries of two certain tracts of land situate in the district of South Hilo on the Island of Hawaii and hereinafter more particularly referred to. The Territory appeared as a party claiming land adjoining one of these tracts and disputing the correctness of the boundaries as described in the petition. One Emily P. Kinney also appeared claiming land adjoining the other of these tracts and similarly disputing the correctness of the boundaries in so far as they affected her interests. The decision, filed on June 2, 1910, was that "The petition is dismissed, without prejudice, at the petitioner's costs." The commissioner, after stating that "the evidence in this case is insufficient to warrant the commissioner in adjudging the boundaries  *  *  *  to be as alleged by the petitioner, by the Territory or by Emily P. Kinney," and that "a preponderance of the evidence shows that the ahupuaa of Kahua, awarded in 1852 to Kahonu, extended in a westerly direction to Huinawai, as alleged by the petitioner," declared that he would "not adjudge the boundary to be as claimed in the application," or at all, "for the reason that petitioner's interest therein is not disclosed by the evidence, no

title having been proved, by the introduction of title deeds or otherwise, to any portion of the said konohiki land. The omission is fatal, for the right to apply for certification of boundaries is conferred, by Section 353 of the Revised Laws, only upon owners of the land, and proof of such ownership is indispensable." The Territory appealed. The petitioner now contends that under the circumstances the Territory has no right to appeal.

Sec. 355, R. L., provides that "any party deeming himself aggrieved by the decision of the commissioner" of boundaries "may appeal therefrom to the supreme court." The issue joined between the Territory and the applicant was tried at length. Much evidence was adduced by each party, and the Territory, as well as, undoubtedly, the petitioner, incurred considerable expense in preparing for the trial and in presenting the evidence. The bill of costs as taxed was in the sum of $516.10. Nearly four years elapsed between the submission of the cause and the filing of the decision. Kamaaina testimony is each year becoming more difficult to obtain in cases of this nature. Witnesses may well have passed away since the trial. Assuming that a transcript of the testimony taken at the trial would be admissible on the trial of a new proceeding between the parties after the death of the witnesses who testified, still the testimony given by living witnesses is ordinarily of greater value and weight than a written statement of their testimony. The petitioner was at the time of the trial and ever since has been in possession of the piece of land now in controversy. The Territory is interested financially in having an adjudication of the boundaries and clearly may deem itself "aggrieved" by the decision of the commissioner and under the statute has the right of appeal therefrom.

The appellee makes no claim that the dismissal of the petition can be supported on the ground, advanced by the commissioner, that there was no evidence of the title of the petitioner to any part of Kahua 2. Under the circumstances of

this case the ruling cannot stand. Assuming that only those holding the title can be petitioners in such cases the Pepeekeo Sugar Co. alléged ownership in itself and that allegation was evidently accepted as true by the Territory and Emily P. Kinney, the only other parties who appeared in the proceedings. No question as to the title was at any time raised by them and the trial was conducted on the theory that the Pepeekeo Sugar Co. was the owner as alleged. Had the Territory or Emily P. Kinney sought on appeal for the first time to have the petition dismissed on that ground they would have been held not to be in a position to present the claim and certainly the commissioner, who is directed by the statute (R. L., Sec. 354,) to "endeavor * * * to obtain all information possible to enable him to arrive at a just decision as to the boundaries," cannot properly, of his own accord and without giving the parties an opportunity to cure the alleged defect of formal proof, dismiss the petition on that ground.

Before entering into the main argument in this court the Territory presented two motions, one for the introduction in evidence of an original map, a copy of which had already been introduced by the applicant, and the other for the taking of a deposition intended to explain the circumstances under which a notation had been made by the witness on a certain other map also introduced at the trial by the applicant. We ruled that even though the proposed evidence was not strictly "newly discovered" within the meaning of the law applicable to motions for new trials in ordinary cases, civil and criminal, it was, nevertheless, admissible under the informal and liberal procedure contemplated by the statute and customary in such cases. The evidence, when admitted, proved to be of but little, if any, consequence.

The petition is that "In the matter of the boundaries of the ahupuaa of Kahua 2nd, L. C. A. 5663 to Kahonu, situate in the district of Hilo, Island of Hawaii," the boundaries "of the remaining portions of this aforesaid land of Kahua 2nd as yet

uncertificated" be adjudicated. L. C. A. 5663 to Kahonu (Apana 2) simply awards "kona Ahupuaa o Kahua ma Hilo, ma ka Mokupuni o Hawaii" ("his ahupuaa of Kahua in Hilo, in the Island of Hawaii"). What was the "ahupuaa of Kahua" named in the award?

In the district of South Hilo, Hawaii, between the Makea stream on the north and the Wahalea or Aliia stream on the south and extending from the sea on the east to a line on the west terminating at the point called Huinawai or Nahuina lies a long narrow strip of land generally known as "Kahua." Of this tract a portion containing an area of 135 acres was on January 17, 1850, sold by the government to John Ely for the consideration of $101.25 and granted by R. P. 194. In this patent, which contains a description by metes and bounds, the granted land is described as being "i kela apana aina a pau e waiho la ma Kahua Akau Hilo ma ka Mokupuni o Hawaii" ("all that piece of land situate at Kahua Akau Hilo in the Island of Hawaii"), and its southern boundary as adjoining, in part at least, "Kahua waena" ("middle Kahua"). Another portion was on July 11, 1853, granted to John Pelham by R. P. 1158, the consideration for the sale being in the patent recited to be services rendered by the patentee in the office of the marshal of the kingdom. This piece contained an area of 127.19 acres and is described in the patent as "i kela apana aina a pau e waiho la ma Kahua 1 Hilo ma ka Mokupuni o Hawaii" ("all that piece of land situate at Kahua 1, Hilo, in the Island of Hawaii"). Neither of these portions extend as far mauka as Nahuina. They adjoin each other a part of their length but elsewhere lies between them a third narrow strip. The latter has been referred to at the argument as a part of Kahua 2, another part of Kahua 2 being admittedly mauka of the Ely grant and north of the Pelham grant. In recent years Kahua 2 as a whole has been referred to by the owners and some others as containing three subdivisions, section 1 being that below the government road which runs north and south, section

2 being that next above the road and section 3 being the portion above the Ely grant. The boundaries of section 1 were settled in 1903 by the commissioner. Sections 2 and 3 are the portions concerning which an adjudication is now asked.

Neither Kahonu's application, dated February 2, 1848, for an award, nor the entry bearing the same date in the mahele book in which the king consents to an award being made to Kahonu as prayed, throws any light on the precise question now being considered as to the identity of the Kahua named in the award itself. Each of these two documents merely describes the land as being "Kahua, ahupuaa, Hilo, Hawaii." These documents, although not introduced in evidence, were examined by us under the power conferred and in pursuance of the duty imposed by Sec. 354, R. L., to "endeavor otherwise to obtain all information possible to enable him to arrive at a just decision as to the boundaries of said lands." On appeal this court possesses in this respect the power granted to the commissioner.

Kahonu was a konohiki. The award to him was of an ahupuaa. While there is some testimony tending to show that the whole of "Kahua" was the ahupuaa, the preponderance of the evidence is, and we find, that the "konohiki Kahua" was Kahua waena or Kahua 2. See the evidence of the following witnesses: F. S. Lyman, Kailihune (w), Kalikanakaloi (w), Kailimai (k) and Gabriel (tr. pp. 156, 211, 212, 262-264, 269, 272, 276-281, 284, 306, 320, 329, 331). See also Territory's Exhibit C, letter of A. B. Loebenstein to J. W. Pratt, who was at the time commissioner of public lands. Kahua 1 and Kahua 3 were never known as konohiki lands. They were known as government lands and were granted for a consideration and not because the patentees had some claim to them by reason of occupation or otherwise under the old system of land tenures in Hawaii. The probability, then, of the only Kahua which remained intact being the konohiki ahupuaa confirms the oral testimony on the subject. The applicant itself so re-

gards the matter, for in the petition it is the ahupuaa of Kahua 2nd, L. C. A. 5663 to Kahonu, and no other, which is referred to and the settlement of the boundaries of which is desired. Some witnesses did, indeed, testify that the names Kahua 1, Kahua 2 and Kahua 3 were purely of recent adoption and were not known in the days of the mahele, but the Pelham patent shows clearly that in this respect these witnesses were mistaken. That patent on its face purports to grant land in "Kahua 1," and the plat which is attached to and made a part of it mentions "Kahua 2" and "Kahua 3."

In this case the Territory is not concerned with the boundaries of section 2 of Kahua 2. Emily P. Kinney is the only contestant in that regard and she does not appeal from the refusal of the commissioner to decide the controversy. The only issue is as to section 3, so called, of Kahua 2. It is agreed by the parties to the appeal that this section begins at the westerly end of the Ely grant and is bounded on the north in part by the Makea stream and on the south in part at least by the Pelham grant. The parties further agree specifically that if the western or mauka end is found to be at the place, formerly a swamp, called Kananaka, the boundaries shall be adjudged to be as set forth in the answer of the Territory, and if found to be at Nahuina then as set forth in the applicant's petition. The only question of boundaries, therefore, is whether the westerly end of section 3 is at Kananaka or at Nahuina.

Upon this point, while much evidence has been adduced, we find no real difficulty. The Pelham patent, which describes by metes and bounds the land granted, ends one of its courses and distances at Kananaka and then says, directly on the point, "oia ke kihi mauka loa Kahua 2," "that is the extreme mauka end of Kahua 2," and the map attached to the patent names the corresponding point in the survey as "Kananaka, end of Kahua 2," containing also the words "Kahua 2" as the name of the land immediately makai of Kananaka, and the words "Kahua 3" as the name of the land immediately mauka

of Kananaka. All of this language is too plain to admit of construction. Pelham, who appears to have made the map and drawn the description, may have been, as is claimed by the present petitioner, an inaccurate surveyor, although it may be noted that A. B. Loebenstein, who signed the petition as the agent of the applicant, and who testified in the latter's behalf, says that a good feature of Pelham's surveys was his references to natural monuments. It may be noted, too, that the mere statement that a given point is the end of Kahua 2 is not a matter of ordinary surveying but was something the knowledge of which was gained from his contemporaries. However that may be, it is immaterial whether Pelham in running his courses and distances was usually inaccurate. The government, the grantor in all three instances, adopted his statement concerning the mauka end of Kahua 2 and made it its own and certified to it in a solemn document over the signature of the king. It is immaterial likewise whether such a statement in a patent is conclusive, for in this case we find nothing in the evidence to outweigh it. It is clear, unambiguous and precisely on the point now in controversy and was made at a time when the facts were fresh in the minds of all concerned.

There was also evidence given by Kanakanui, a surveyor, showing the existence of a gulch or swale extending from a point near Kananaka on the southwest to a point in Makea stream on the northeast. The location of this gulch corresponds substantially, although not with exactness, with the northwesterly end or side of the section in question as is shown by a dotted line on the Pelham plat. It is conceded by counsel for the petitioner that in so far as there is a divergence between the course as shown by the dotted line and the gulch the latter, as the natural monument, must prevail.

If there were no other evidence in the case, that above considered would require the declaration that Kahua 2 extends

only to Kananaka. We shall now consider the evidence offered to rebut this showing.

A map and certain triangulation data, said to have been made by J. M. Lidgate, a surveyor, were introduced by the applicant, but Lidgate himself was not called as a witness. The map, and perhaps the triangulation data also, show that their author's conclusion was that Kahua 2 extended as far as Nahuina, but upon what facts, information or study this conclusion was based does not appear in the evidence. For aught that appears to the contrary it may have been based upon no. more than we have before us now. Under the circumstances we can attach no weight to these exhibits.

Certain government leases were also introduced in which certain courses and distances of the demised property are described as running "across head of Kahua" to Nahuina. It is sufficient to say of these that it is undisputed that the land immediately below the line terminating at Nahuina is Kahua. The sole issue is as to whether it is a part of Kahua 1, Kahua 2 or Kahua 3, and upon this issue the statement in the leases throws no light.

Registered map No. 939 of the survey department of the Territory includes the outlines of the land of Kahua as a whole as well as of many lands to the north and others to the south and has the words "Kahua 2nd" written substantially across the portion in dispute. This map was presumably based upon patents and leases and perhaps upon some kamaaina testimony, although this was not made to appear by the evidence. It.is simply the conclusion of the government surveyor reached on practically the same evidence that we are now considering. See *In re Boundaries of Pulehunui*, 4 Haw. 239, 251. Even though admissible, we deem it insufficient to counteract the showing of the Pelham grant and plat.

Certain maps and tracings made by A. B. Loebenstein, as well as his testimony, were produced by the applicant. It was Loebenstein's claim, as presented in his testimony and indi-

cated in his maps, that the land from Kananaka to Nahuina
is a part of Kahua 2 and not of Kahua 3. We find ourselves
unable to attach any weight to this evidence in view of the
statements and claim contained in Loebenstein's letter to Land
Commissioner Pratt (Territory's Exhibit C), admittedly writ-
ten one or two years prior to the date of the present petition,
to the effect that there was still a government remainder of
Kahua 3. The whole tenor of his letter is directly opposed to
the claims made by him at the trial.

As to the kamaaina testimony. F. S. Lyman, whose experi-
ence as surveyor and commissioner of boundaries for many
years on the Island of Hawaii entitles his testimony to much
weight, while he testified with considerable detail concerning
the Ely and Pelham grants, concerning the history of land
tenures in Hawaii, both before and after the mahele, the names
of the three Kahuas, and the identity of Kahua 2 as the only
konohiki land, on the subject of the boundary in question says
that "of the Kahuas Kahua 2nd ran farthest mauka," and
nothing more. He does not say specifically whether the
boundary was at Kananaka or at Nahuina. A. B. Loeben-
stein's evidence has been already disposed of. J. K. Dillon
and D. A. Loebenstein give no evidence on the subject of the
mauka boundary. The same is true of Waialani, although ap-
parently an attempt was made to qualify him as a kamaaina.
Kailihune (w), basing her testimony upon statements made
to her by her father, Kamaka, and her grandparents, Kamaka
having been at one time the owner of the konohiki land, tes-
tified that the konohiki Kahua runs to Nahuina (tr. pp. 265,
269), but also testified that there were "difficulties" about the
boundary at the time that these statements were made to her
(ib. 270). The witness added that Kailimai's grandmother,
Makua, who was the caretaker for the konohiki, told witness'
father about the boundary and then her father told witness.
She made many confused and contradictory statements and
her evidence was not as clear and definite as it ought to be in

order to warrant disregarding the record evidence already adverted to.

Kalikanakaloi (w) heard from kamaainas that the konohiki Kahua extended from the ocean to the koa (tr. 280), but there is no exact evidence from this or any other witness as to where the koa began. Noa (k) testified that Wahamu, who in turn is claimed to have been a well informed kamaaina, told the witness that the mauka boundary of Kahua 2 was a little above a koa tree the witness had seen the day before in the absence of Wahamu (ib. 290). Where that particular koa tree stood with reference to Nahuina is not made to appear (ib. 289, et seq). This testimony is not enlightening. Ananaia's statement was that his "forefathers" had told him that the remainder of the ahupuaa between the two streams, after taking out the two grants, extended to koa five fathoms high (ib. 296); that "Kahua" ran to Nahuina (ib. 297). The witness was referring to "all of the Kahua including the Pelham grant and the Ely grant," and later testified that a portion of Kahua 3 "extends from the upper boundary of the Pelham grant up to the end, about a mile," and about one-half mile makai of the mauka boundary of the Pelham grant (ib. 299), and that five-fathom koa was the mauka boundary of "that whole ahupuaa known as Kahua, of the whole tract, Kahua 1, 2 and 3, and not of any particular section" (ib. 300), and still later that Kahua 3 and "Kahonu Kahua" was "the same thing" and that "Kahua 2nd is the Ely grant" (ib. 303). This testimony is conflicting and confused and some of it, at least, obviously incorrect. It is immaterial whether this was due to ignorance, to loss of memory, or to design. It is unreliable.

There were no other witnesses for the applicant on this point. For the Territory, Kailimai (k), Gabriel and Keliikoa (k) testified that the boundary of the konohiki Kahua was at Kananaka and that above that was Kahua 3 (tr. 305, 307, 309, 320, 423, 424). To what degree of weight the testimony of these three witnesses is entitled we need not say. It supports,

Boundaries of Kahua 2, Hilo, 20 Haw. 278.

as far as it goes, the written evidence of the Pelham patent. It is sufficient to say that the kamaaina testimony for the applicant cannot avail as against the showing contained in the Pelham patent and map. It is unfortunate, perhaps, that the kamaainas possessing direct knowledge on the subject of boundaries in various parts of the Territory are rapidly passing away, and in their absence the court cannot do better than to base its findings upon the written statements of the king or government, the common grantor, made at or about the time of the mahele.

It may be that in some cases where an issue relating to boundaries is, upon the evidence, close and difficult of determination, great weight should be given to the conclusion reached by the commissioner, on the theory that he had before him the witnesses themselves and was able to observe all of the usual indicia of truthfulness, memory and accuracy, but in this case resort will not be had to that rule partly because the issue is not sufficiently close to require its application and partly because the statement of the commissioner to the effect that the mauka boundary is at Nahuina is not supported by any reasoning expressed in the opinion itself and also because that statement was plainly obiter dictum. He did not decide the point, but refusing to decide it, dismissed the petition.

Our finding is that the westerly or mauka boundary of Kahua 2 is at Kananaka and not at Nahuina. The boundaries of section 3 of Kahua 2 will be certified to be as set forth in the answer of the Territory.

*C. S. Smith* for Pepeekeo Sugar Co.

*W. B. Lymer (Alexander Lindsay, Jr., Attorney General,* with him on the brief) for the Territory.