STATE OF HAWAII, by Bert T. Kobayashi, its Attorney General *v.* FRANK E. MIDKIFF, *et al.,* Trustees under the Will and of the Estate of Bernice P. Bishop, Deceased.

No. 4415.

DECEMBER 5, 1966.

RICHARDSON, C.J., CASSIDY, WIRTZ, AND LEWIS, JJ., AND CIRCUIT JUDGE KITAOKA IN PLACE OF MIZUHA, J., DISQUALIFIED.

458

OPINION OF THE COURT BY LEWIS, J.

The State seeks to eject the trustees of the Bishop Estate from 857 acres of land in the District of Ewa, Island of Oahu, contending that this land was not awarded by the Land Commission, or by the Minister of Interior under the Acts of August 24, 1860 and December 16, 1892 (S.L. 1860, p. 27; S.L. 1892, c. 68), and remains the property of the government under the doctrine of *Thurston* v. *Bishop,* 7 Haw. 421 (1888). It appeals from a summary judgment which dismissed the action on the grounds, among others, that the land in question was awarded by survey by Land Commission Award 7713, Apana 35, to Victoria Kamamalu, and that the plaintiff and its predecessors have acquiesced in defendants' possession. It is undisputed that the defendant trustees are the successors in interest of Victoria Kamamalu, but the State contends that the award

was of an ili by name, that there is a genuine issue of fact as to whether the ili included the land in dispute, and that plaintiff is not foreclosed by defendants' possession.

A summary judgment is analogous to a directed verdict. 6 Moore, *Federal Practice,* § 56.04(2), at 2044 (2d ed.). If the court is satisfied that it has the complete facts and that there is no question of credibility, it may grant a summary judgment. *Wier* v. *Texas Co.,* 180 F.2d 465, 469 (5th Cir.) ; *National Dynamics Corp.* v. *Petersen Publishing Co.,* 185 F. Supp. 573, 576 (S.D.N.Y.). The burden of marshalling a record making the required showing is on the defendants as movants, though plaintiff would have the burden of proof at trial. *Mossman* v. *Hawaiian Trust Co.,* 45 Haw. 1, 9-10, 361 P.2d 374; 6 Moore, *Federal Practice,* § 56.15(3) (2d ed., rev. 1965). Thus the question is whether defendants have succeeded in proving that if the case went to trial there would be no issue for the jury. *Mossman* v. *Hawaiian Trust Co., supra.*

Though the parties have been most industrious, the record is fragmentary due to the efflux of time. Upon argument, counsel for the State was asked whether, if the case went to trial, the State would rest on what already had been presented. Counsel was unwilling to state that no more evidence would be adduced, stating that he did not wish to foreclose himself. He conceded that, if anything more were to be put in, it would be "not much more—very little more." Applicable here is the statement in 6 Moore, *Federal Practice,* § 56.15(3), at 2343-44 (2d ed.), that an opposing party who cannot show that countervailing evidence will be available at the trial, is not entitled to denial of the motion for summary judgment "on the basis of a hope that such evidence will develop at the trial." We conclude that we are in as good a position as we ever will be to determine whether the case is one for a jury or whether on trial a verdict would have to be directed.

The case falls under the well settled rule that "in eject-ment a plaintiff must recover upon the strength of his own title and not upon any weakness in the defendant's title." *Fong Hing* v. *Yamaoka,* 31 Haw. 436, 438 (1930). How-ever, the State being the plaintiff, claiming the land as unawarded land, it would prevail in the absence of a show-ing that the land was awarded. *In re Pa Pelekane,* 21 Haw. 175, 185 (1912) ; *State* v. *Jadwin,* 85 S.W. 490, 491-92 (Tex. Civ. App.). In this case it is not disputed that there was an award, the dispute being as to the extent of it.

We first will review the situation of the land and the evidence as to the award, and then will take up the con-struction of the award by the parties.

I. *The Situation of the Land and the Evidence as to the Award.*

By way of background, we take judicial notice that Victoria Kamamalu inherited vast lands from her mother, Kinau, who died in 1839. Kinau, a daughter of Kame-hameha I, succeeded Kaahumanu as premier, or kuhina nui. She was a half-sister of Kamehameha III, in whose reign she was appointed. Kamehameha III continued as reigning monarch during the Mahele of 1848 and the ensu-ing proceedings of the Land Commission.

The earliest record of the land in dispute is a lease made in 1842. At that time Victoria Kamamalu was a minor. Her minority continued during the Mahele and the Land Commission proceedings. As appears from nu-merous cases decided by this court and from the record herein, her affairs were handled by her father, M. Keku-anaoa, Governor of Oahu. In this instance, he named him-self as lessor, but as will appear he elsewhere recognized that the land was not his but Victoria's. The lease undoubt-edly related to the land which is the subject matter of the present action. Drafted in the English language, it de-mised to one Dudoit as a pasturage, for a term of ten years,

a piece of land "in the upper part of Waiau in Ewa," lying between Waimalu, the eastern boundary; Waimano, the western boundary; the road to Ewa, the southern boundary; and "the mountain," the northern boundary. We shall have occasion to comment hereafter on other features of this lease.

As appears from the Principles adopted by the Land Commission on August 20, 1846, and approved by the Legislative Council on October 26, 1846, S.L. 1847, p. 81 at 91, under the law then obtaining the King's and Premier's consent was necessary for this lease. It in fact was assented to by Kamehameha III and Kekauluohi, the Premier. Their signatures on the document attest that the land was in the private ownership of Kekuanaoa to the extent that private ownership was possible at the time, and as will appear Kekuanaoa held it in behalf of Victoria. We reject the suggestion made at argument that Kekuanaoa was acting as the King's agent. By the terms of the lease, which was approved by the King and Premier, the rent was to be paid to Kekuanaoa, his heirs or assigns, and upon the expiration of the lease the land was to revert "to Mr. Kekuanaoa, his heirs or assigns, the owners of the land."

The King of course did have private lands at this time. As stated in the Principles adopted by the Land Commission on August 20, 1846, and approved by the Legislative Council on October 26, 1846, S. L. 1847, p. 81:

"When the islands were conquered by Kamehameha I., he followed the example of his predecessors, and divided out the lands among his principal warrior chiefs, retaining however, a portion in his hands, to be cultivated or managed by his own immediate servants or attendants."

On December 14, 1847, by resolution of the Privy Council, as translated, Dr. G. P. Judd, Minister of Finance, was appointed "as one to contact those who know the King's

own lands, and to make a report of same to the King and Privy Council." At the same time, William L. Lee, Chief Justice, who was also a member of the Privy Council and a member of the Land Commission, was asked to submit an outline of rules for the Mahele. As set out in Alexander, *A Brief History of Land Titles in the Hawaiian Kingdom*, Appendix to Surveyor General's Report, 1882, p. 13, reprinted in Thrum's Annual, 1891, 105 at 112, Judge Lee submitted these rules and they were adopted by the Privy Council on December 18, 1847, the first one stating:

"1—His Majesty, our Most Gracious Lord and King, shall in accordance with the Constitution and Laws of the Land, retain all his private lands, as his own individual property, subject only to the rights of the Tenants, to have and to hold to Him, His heirs and successors forever."

Dr. Judd received lists of the King's private lands from various chiefs. Those listing Waiau, three in number, are part of the record, having been produced by the State. Other lists, not naming Waiau, have not been made part of the record. On trial, the exhibit could be made complete, and the backgrounds of the chiefs compiling the several lists could be supplied. However, this would serve no useful purpose.

In the first place, it appears from the record we have that the lists were not reliable. For example, the Ahupuaa of Waimanalo, Island of Oahu, was listed as the King's own land on two of the lists, but this ahupuaa was also listed as Victoria's on a list of her lands compiled in 1845 and approved by the Legislative Council. The latter was correct as appears from the fact that on page 1 of the Mahele Book it was surrendered to the King by Victoria (*i.e.,* by Kekuanaoa acting in Victoria's behalf), as part of the division of Victoria's lands.

In the second place, as can be seen from the Privy Coun-

cil record, the lists were received in preparation for the Mahele. In the Mahele itself Waiau was not listed as the King's. That is, on March 8, 1848, after the division of the chiefs' lands had been completed, the King by two further lists signed in the Mahele Book divided his lands between the government and himself but nowhere mentioned Waiau, except as the location of certain ilis which had been surrendered to him by chiefs in the Mahele. The Act of June 7, 1848 (S.L. 1848, p. 22), confirming this action by the King, was the same. By the Act of November 14, 1890 (S.L. 1890, c. 75), additional lands were set apart as crown lands but Waiau again was not mentioned.

In this situation it would not be reasonable to give credence to the theory that at the time of the 1842 lease the land in dispute was the King's own land and Kekuanaoa was merely his agent. The signatures of the King and Premier on the 1842 lease are decisive, as against the listing of Waiau on some of the lists received in preparation for the Mahele but not followed or put into execution in the Mahele or thereafter. As stated in another case in which there was a dearth of live testimony, *Boundaries of Kahua 2,* 20 Haw. 278, 289 (1910):

"* * * It is unfortunate, perhaps, that the kamaainas possessing direct knowledge on the subject of boundaries in various parts of the Territory are rapidly passing away, and in their absence *the court cannot do better than to base its findings upon the written statements of the king or government, the common grantor, made at or about the time of the mahele.*" (Emphasis added.)

Even though we conclude that before the Mahele the land was Kekuanaoa's, held by him for Victoria, and was not the King's private land, all that Kekuanaoa had at that time was a qualified right and, as is well settled, an award had to be obtained for the land, otherwise it was

the property of the government. *Thurston* v. *Bishop, supra,*
7 Haw. 421. The court below held that an award was
obtained. The State does not dispute that the Ili of Kumu-
ulu, an ili of Waiau, was awarded to Victoria Kamamalu,
its contention being that the land in dispute was kula or
dry land of the Ahupuaa of Waiau that was not part of
this ili, and that the ili itself was a parcel of about ten
acres.

The outer boundaries of the Ahupuaa of Waiau, so far
as pertinent here are not in dispute. There is a record of
an early proceeding in which there was testimony that
"Waimano cuts off the upper part of Waiau, and Waimalu
there adjoins Waimano."[1] This would mean that Waiau
did not extend to the ridge of the Koolau mountains divid-
ing the island. But as the subject matter of this dispute is
857 acres of land lying south of the forest reserve, and as
the State in its complaint has described the land as a por-
tion of the Ahupuaa of Waiau, we are not called upon to
say whether the State has a claim to forest reserve land.

Use of the term "ahupuaa" is misleading unless it is
borne in mind that this term is used sometimes in the sense
of a land subdivision smaller than a district, and some-
times in the sense of a tract of land held by the King or a
chief as a unit under the feudal system then obtaining.
It must be remembered that the ancient divisions of land
were made long before the time of Kamehameha I. "[F]rom
prehistoric times, every portion of the land constituting

---

[1] While theoretically an ahupuaa ran from the sea to the summit of
the mountain, in order that the natives might share in all the different
products of the forest, soil and sea, in actual practice, particularly on
the island of Hawaii, the ordinary ahupuaa did not run to the top of
the mountain but only to or into the zone of timber land, being cut off
from the top of the mountain by the larger ahupuaas. Lyons, *Land
Matters in Hawaii—Nos. 1 and 2,* Islander, 1875, pp. 103, 111. This
matter was noted in *Boundaries of Pulehunui,* 4 Haw. 239, 241 (1879),
where the court said:
"* * * some of the lands were for some reasons not always under-
stood, and perhaps arbitrary in the beginning, very wide at the top,
cutting off a great number of other lands from the mountain * * *."

these Islands was included in some division, larger or smaller, which had a name, and of which the boundaries were known to the people living thereon or in the neighborhood."[2] As conqueror, Kamehameha I redistributed the land among his chiefs, retaining some under the management of his own agents.[3] The lands were distributed in such manner that sometimes ilis physically situated within the outer boundaries of an ahupuaa were held by chiefs who paid no tribute to the chief holding the ahupuaa. These independent ilis were known as ili kuponos, in contradistinction to the ilis of the ahupuaa, which were subdivisions of the ahupuaa for the convenience of the chief holding the ahupuaa. The ili kuponos were not considered part of the ahupuaa.[4] Thus, from the standpoint of tenure under the feudal system, the ahupuaa was what remained after excluding the ili kuponos.

The names of eight ilis in Waiau are shown by the record. These eight ilis all were held directly under the King, as can be seen from the Mahele Book. According to *Harris* v. *Carter, supra,* 6 Haw. 195, 207 (opinion of single justice, 1877) the fact that the ilis were recognized and treated in the Mahele indicated that they were ili kuponos.

Defendants say there were only these eight ilis in Waiau, and that they account for all of the land within the outer boundaries of the ahupuaa of that name. Kumuulu, according to this contention, comprised 2522 acres, including not only the ten acre parcel which the State says was the Ili of Kumuulu, but also more than 2510 acres of upland and forest, running to the ridge of the Koolau mountains dividing the island, which the State says was not Kumuulu. Great reliance is placed by the State on

[2] *Boundaries of Pulehunui, supra,* 4 Haw. 239, 240-41 (1879).

[3] Alexander, *A Brief History of Land Titles in the Hawaiian Kingdom,* Appendix to Surveyor General's Report, 1882, p. 8, reprinted in Thrum's Annual, 1891, 105 at 108.

[4] *Harris* v. *Carter,* 6 Haw. 195, 206 (opinion of single justice, 1887).

Bishop's map, prepared in 1854, which has the words "Ili o Kumuulu" lettered in on a small parcel below the paaina or wall there indicated, while the land above is not designated other than by the general heading on the map itself "Ahupuaa o Waiau, Ewa, Oahu, 2522 na Eka." Accompanying the map was a survey headed "He ana i ka Iliaina o Kumuulu me ka Kula i Waiau, Ewa, Oahu," which has been translated "Survey of the Iliaina of Kumuulu, and the (kula) dry land of Waiau, Ewa, Oahu," but which is more accurately translated "Survey of the Iliaina of Kumuulu with the upland at Waiau, Ewa, Oahu." We shall dwell on this map and survey at more length hereafter.

The State also relies on a tax record of 1847 which shows Kumuulu taxed $2.00, while Kaakauwaihau, another ili of Waiau, was taxed $3.00. The latter ili contained approximately 17 acres. The tax in question was laid under Article II of Chapter II, Part III, Second Act of Kamehameha III (S.L. 1846, p. 165), from which it appears that the tax was based not merely on the size of the several ilis but also on the number of occupants and the value. The tax record showed the number of occupants, also the mooainas (narrow strips of land within the ili), cultivated and uncultivated. Kaakauwaihau had more working occupants and more mooainas in cultivation than Kumuulu. Barren tracts of land, such as the land here in dispute, were regarded as "comparatively worthless," while "the taro lands * * *. constituted the main value of the land in early times." *Boundaries of Kapoino,* 8 Haw. 1, 2 (1889) ; *Boundaries of Paakea,* 5 Haw. 154, 156 (1884) ; *Boundaries of Kapahulu,* 5 Haw. 94, 95 (1883). We conclude that this tax record is of little significance in determining the extent of Kumuulu.

The location of the other seven ilis of Waiau, *i.e.,* Kaluaolohe,[5] Kaluaoopu, Honokawailani, Kaakauwaihau, Na-

---

[5] For the history of this ili, see *Pedro* v. *Chun Yun Fan,* 4 Haw. 461 (1882).

ono, Nalima, and Kauhihau, is not in dispute. All were located below the line of the paaina[6] indicated on Bishop's map, with the possible exception of the mauka or northern portions of Kaluaoopu and Honokawailani, ilis to the west of Kumuulu. The last mentioned ili was surrendered to the King in the Mahele by a chief named Kanui, and was designated crown land by the King. There is no further evidence as to it. The former, Kaluaoopu, was maheled to the chief, Iona Piikoi, sometimes referred to as Jona Piikoi, who obtained an award for it, occasioning some controversy with Kekuanaoa, appearing as the adjoining owner of the kula above the paaina, which the State says was not Kumuulu. This matter is reviewed more fully below.

Four of the ilis of Waiau were Puhi's. In the Mahele this chief surrendered three of the four to the King, receiving one ili for which he afterward received an award. The State says that Puhi was the konohiki of the ahupuaa, but there is no record that he ever claimed more than the four ilis. State's Exhibit 13, an application by Puhi to the Minister of the Interior, lists these four ilis, *i.e.,* Kaakauwaihau, Naono, Kauhihau and Nalima, under the heading "Oahu i Ewa Waiau ahupuaa" (Oahu in Ewa Waiau ahupuaa). State's Exhibit 9, the tax record of 1847, under the heading "Ahupuaa o Waiau mai ke Lii ia Puhi" (Ahupuaa of Waiau from the King to Puhi), lists in one column seven of the eight ilis of Waiau, including three of Puhi's, with the names of "Konohiki a ke Lii" (the King's konohikis) opposite the several ilis in a second column. These exhibits suggest that Puhi's ilis were ilis of and comprised the ahupuaa, while the others were ili kuponos. In view of the 1842 lease approved by the King and Premier, these exhibits do not permit a finding that the disputed land was Puhi's.

---

[6] This word has been used by the parties as meaning a wall. It literally means fenced land. On the map referred to the paaina is indicated by a dotted line.

Another lease of the land in dispute was made by Keku-anaoa in 1851. This lease, made in Hawaiian, described the land as "apana aiana kula o'u ma Kumuulu Ili aina ma Waiau i Ewa" (parcel of kula land of mine at Kumu-ulu, Ili Aina, at Waiau, Ewa). The lease was recorded in the Bureau of Conveyances, which had been established by the Second Act of Kamehameha III, Part V, Title II, Chapter II, Article I, S.L. 1845-46, p. 246.

The 1842 lease, made in English, did not contain the name "Kumuulu." However, it did contain pertinent infor-mation. It referred to the land as "common land in the upper part of Waiau," and provided that "if the cattle destroy that which is planted by the people then I. Dudoit [the lessee] shall pay the loss sustained by the planter." This evidently referred to the rights of the hoaainas, which were recognized by the Joint Resolutions on the Subject of Rights in Lands and the Leasing, Purchasing and Divid-ing of the Same, approved November 7, 1846 (S.L. 1847, p. 70). These joint resolutions constituted, as stated in *Oni* v. *Meek*, 2 Haw. 87, 91-2 (1858), a declaratory enact-ment, and they afford information as to the character of the old system of tenure of lands, in existence before the Mahele and the proceedings of the Land Commission. As set out by the joint resolutions referred to:

"1. The rights of the *Hoaaina* in the land, consists of his own taro patches, and all other places which he himself cultivates for his own use, and if he wishes to extend his cultivation on unoccupied parts, he has the right to do so." (S.L. 1847, p. 70.)

The plain meaning of the 1842 lease was that there were hoaainas, tenants of the chief giving the lease, who had extended or had a right to extend their cultivation to the unoccupied, common land, and who were protected by the terms of the lease. These hoaainas could only have been tenants of Kumuulu. Thus, from the standpoint of

usage, the upland appears to have been an appurtenance of Kumuulu. The State argues that the upland and wet land were two separate pieces, but this is immaterial. The upland could have been part of Kumuulu even if it was considered to be a separate piece.[7]

We note that the upland of Waiau was only partially contiguous with the lower wet land of Kumuulu. Approximately two thirds of the upland abutted on the south on ilis other than Kumuulu. That is, if the upland be viewed—for the purpose of making the point clear—as composed of three long strips, the southern ends of which abutted on the wet lands of Waiau, only the middle strip abutted on the Kumuulu wet lands. Upon comparison with the adjoining Ili of Kukona, in the Ahupuaa of Waimano, Land Commission Award 11029, we find that the Ili of Kukona consisted of a pond, plus 6.691 acres of land below the paaina, and 512.5 acres of kula above the paaina, abutting in part on the six acre piece but for most of the southern boundary abutting on other ilis. The survey of Kukona, made by the same surveyor who made the survey for Kumuulu, A. Bishop, was of three separate apanas, yet all comprised but one ili. This was common practice. See, for example, *Boundaries of Kewalo,* 3 Haw. 9 (1866). It makes no difference, therefore, in the determination of this case, whether the kula or upland was considered a separate piece or not.

Another feature of the 1842 lease deserves comment. It

---

[7] As stated in Lyons, *Land Matters in Hawaii—No. 3*, Islander, 1875, pp. 118-119:

"* * * the ili often consisted of several distinct sections of land, one, for instance on the seashore, another on dry, open land, or *kula*, another in the regularly terraced and watered kalo patch or aina loi district, and another still in the forest, thus again carrying out the equitable division system which we have seen in the ahupuaas. These separate pieces were called *lele*, *i.e.*, 'jumps,' and were most common on Oahu. * * * In Kalihi, and also in Ewa are ilis with from eight to ten different *leles*, * * *.

"These different pieces were called variously, either by their own individual name, or by that of the whole ili, thus puzzling one sadly when attempting to obtain information with respect to them."

states that "the timber of the mountain is not transferred, that shall continue to belong to the Government." By the Act of November 9, 1840, it had been provided that the King "taboos all large trees such as one man cannot clasp." The Fundamental Law of Hawaii, p. 32. This was amended by the Act of May 31, 1841. The Fundamental Law of Hawaii, p. 56. By the Second Act of Kamehameha III, Part III, Chapter VI, Section VII (S.L. 1845-46, p. 192), it was provided that, subject to the rights of the people: "The forests and timber growing therein, shall be considered as government property, and under the special care of the minister of the interior * * *." Whether these laws explain the statement in the lease concerning the timber, or whether Kekuanaoa did not claim the timber land at that time,[8] we need not say. As has been noted, we are not called upon to pass on the title to the forest lands.

In 1845, when a list of Victoria's lands was compiled and approved by the Legislative Council, Kumuulu was not listed among Victoria's lands,[9] nor was Waiau. However, on January 27, 1848, the King maheled to her "Kumuulu," described as "Ili no Waiau" (Ili of Waiau), and as being situate at Ewa, Oahu. In evident anticipation of the signing of the Mahele, Kekuanaoa applied to the Land Commission on her behalf on January 4, 1848. This application, No. 7713, listed many lands, all "mai ka Mahele ana o ka moi" (from the Mahele by the King). There was no award on the land here involved until April 7, 1854. Meanwhile, on August 27, 1850, by agreement approved by the Privy Council, Kekuanaoa, on behalf of Victoria, had surrendered to the government some of the lands

---

[8] Compare *Boundaries of Kaohe*, 8 Haw. 455, 458-59 (1892), concerning a survey made by C. J. Lyons, in which on the instructions of the high chief John Ii "that above the line of forest on the mountain the land belonged to the Government," Mr. Lyons ran the line accordingly.

[9] A "Kumuulu" or "Kumuula" was listed, but it was at Waikiki. It was surrendered to the King in the Mahele.

maheled to her, in lieu of commutation. This was part of a second division of lands which took place in the summer of 1850, when most of the chiefs ceded a third of their lands to the government in settlement of commutation.[10]

On September 21, 1852, Jona Piikoi's application for the ili of Kaluaoopu in Waiau came on for award by survey. A. Bishop made this survey, the same surveyor who made the survey for Kumuulu in 1854. He described Kaluaoopu as abutting on "kula o Kumuulu" (kula of Kumuulu) along its whole northern boundary. His survey was incorporated in the award to Piikoi. Likewise, on the map made part of Piikoi's award, "Kula o Kumuulu" was shown as adjacent on the north. This was not possible unless Kumuulu included the disputed upland, as explained hereafter.

Endorsed at the foot of the survey, which showed Piikoi's piece as containing 15 7/10 acres, was a note in Hawaiian which we translate[11] as follows:

Kahehena objects to the kula parcel outside of the paaina (belonging to M. Kekuanaoa). Said land contains one acre, which has been taken from said kula, leaving 14 7/10 acres.

Below this note in Hawaiian was a note in English signed by G. M. Robertson, one of the Land Commissioners, stating:

"The above survey shown to M. Kekuanaoa and by him approved, this 23d day of Sept. 1852."

On the date of this last mentioned note, September 23, 1852, Kekuanaoa wrote the Land Commissioners a letter, the body of which has been translated as follows:

---

[10] Alexander, *A Brief History of Land Titles in the Hawaiian Kingdom*, Appendix to Surveyor General's Report, 1882, p. 16, reprinted in Thrum's Annual, 1891, 105 at 114.

[11] We have been furnished with two translations. That furnished by the Attorney General more accurately expresses the true sense of this note, and we follow it in substance.

"That kula which J. Piikoi spoke to you in the Ili aina of Victoria, at Kumuulu, which we said was to be J. Piikoi's this kula is to belong to J. Piikoi, but my man will go down and measure it properly."

As appears from the map, made part of Piikoi's award, Piikoi's piece was L-shaped. Toward the mauka or northern end of the L, a paaina or wall was indicated by a dotted line. This paaina, as we have noted, appears on other maps, and according to the State, Kumuulu lay to the east entirely below the paaina. If the State is correct, Kumuulu did not come anywhere near Kaluaoopu, Piikoi's piece. Only if Kumuulu included the upland beyond the paaina was Kumuulu adjacent to Kaluaoopu. To get the picture one must think of the upland as a long arm and back of the hand, and the ten acre parcel which concededly was Kumuulu as the middle finger. Kumuulu, then, could not adjoin Kaluaoopu, the little finger in this example, unless the upland also was Kumuulu.

A. Bishop's map of Piikoi's piece showed approximately an acre of Kaluaoopu extending beyond the paaina on the north. It is evident that Kekuanaoa made some objection to this, and that an arrangement was made with the approval of the Land Commission, the exact nature of which is not clear. We find evidence of the Land Commission making such adjustments in *Keelikolani* v. *Robinson,* 2 Haw. 522, 550 (1862), where the authority of the Land Commission to do so was upheld.

At this point it becomes necessary to refer to certain principles established by past decisions of this court. The first one is that the naming of the adjoining lands in an award of the Land Commission is not in itself determinative of the correctness of these appellations, the reason being that the Land Commission was not adjudicating as to the adjoining lands but only as to the land of the applicant before it. *Boundaries of Paakea, supra,* 5 Haw.

154, 156 (1884); *In re Kakaako,* 30 Haw. 666, 671 (1928). But insofar as Land Commission proceedings on an application before it are indicative of the Land Commission's views as to the status of the adjoining lands, such proceedings are of value as evidence in that regard in the absence of a decision of the Land Commission directly in point. *In re Pelekane, supra,* 21 Haw. 175, 186-87 (1912); *In re Kakaako, supra,* 30 Haw. at 675 (1928).

Another principle is that maps and surveys are of no greater value as evidence than the information on which they were based. *Boundaries of Kapahulu, supra,* 5 Haw. 94 (1883). If a map or survey is the expression of original kamaaina testimony or contemporary knowledge at or about the time of the Mahele, it has value as such. *Boundaries of Pulehunui, supra,* 4 Haw. 239, 251 (1879); *Boundaries of Kahua 2, supra,* 20 Haw. 278, 285 (1910). But a map which represents merely the conclusion of the surveyor reached on substantially the same evidence the court has before it is to be treated accordingly. *Boundaries of Pulehunui, supra,* 4 Haw. 239, 251 (1879); *Boundaries of Kahua 2, supra,* 20 Haw. 278, 286 (1910).

Considering now what transpired in connection with Piikoi's award, it is evident that the survey and map of Kaluaoopu made in 1852 represent contemporary information, furnished to the surveyor, A. Bishop, that Kumuulu was the adjoining property on the north. This information may have been furnished by kamaainas or by Piikoi himself. It also is evident that when Kahehena, on behalf of Kekuanaoa, objected to the one acre extension of Piikoi's ili beyond the paaina, the Land Commission regarded Kekuanaoa as an adjoining landowner, who had standing by virtue of the pending application for Kumuulu. Piikoi apparently did not contest his standing. However, the adjustment made as to the one acre piece necessarily involved acceptance by the Land Commission of Kekua-

474

naoa's authority over the area which Kekuanaoa, in his letter to the Land Commission, spoke of as "kula * * * in the Ili aina of Victoria, at Kumuulu, which we said was to be J. Piikoi's." Piikoi's acquiescence in Kekuanaoa's standing as an adjoining landowner in itself is highly significant. Piikoi was a knowledgeable man,[12] a member of the Privy Council.

Nearly two years later, on April 7, 1854, the Land Commission made a large number of awards to Victoria Kamamalu for separate lands designated as apanas of Land Commission Award 7713. The exhibit in the record contains 18 pages of awards signed April 7, 1854, including one award to another awardee, appearing between Apanas 24 and 25 of Land Commission Award 7713. The exhibit runs through Apana 42, but there were more apanas than this in Land Commission Award 7713. From examination of the pages of the award book it is evident that the numerous awards signed on April 7, 1854 were prepared in advance for signature by the Commissioners in the award book. This court has taken notice of the practice of the Land Commission office of making entries in the award book in preparation for signature by the Commissioners. *State* v. *Hawaiian Dredging Co.*, 48 Haw. 152, 170, 397 P.2d 593, 604 (1964) ; *Boundaries of Kewalo, supra*, 3 Haw. 9, 15 (1866). In the preparation of the several awards signed April 7, 1854, space was left for the signatures of the Commissioners opposite the schedule of costs, and the signatures appear in this space in each instance. The signatures were not at the foot of the respective awards. In each award there appears after the schedule of costs and the signatures a material part of

[12] In 1866 this court stated that "Piikoi, as is well known to every member of the Court, was a shrewd man of business, who looked well to his own interests * * * ;" and that he was "a *Luna* or Land Agent for the King, and was also in the employment of the government under him (Dr. Judd) * * *." *Boundaries of Kewalo*, 3 Haw. 9, 13.

the award, that is, either the words "Eia na palena"[13] (here follow the boundaries), followed by a survey, or the words "Ua hooko aku makou i keia kuleana mamuli o na oleo o na Kanawai i hooholoia ma ka la 19 o June M. H. 1852, e pili ana i na Konohiki" (We have granted this kuleana (right) in pursuance of the Laws passed on the 19th day of June, in the year 1852, pertaining to Konohikis). In one instance appearing in the record, Apana 27 of Land Commission Award 7713, the words "Eia na Palena" were not followed by a survey, but instead by a statement that the award was made under the Act of June 19, 1852. We shall have occasion to comment on this instance in note 15, *infra*.

As stated in *Boundaries of Kewalo, supra,* 3 Haw. 9 (1866) "the phrase [Eia na Palena] * * * was never used except when an award was made by survey." (3 Haw. at 12.) This case held that where the phrase "Eia na Palena" was used and a survey was copied into the award, then the award was not by name, and any reference in the award to the Act of June 19, 1852 (S.L. 1852, p. 28) was manifestly inconsistent and to be treated as void (*Id.* at 15). In other words, there were two distinct types of awards, one by survey, earmarked by the phrase "Eia na palena," and the other by name, earmarked by a reference to the Act of June 19, 1852. The 1852 Act for the first time permitted the Land Commission to award by name, without survey, an ahupuaa or ili maheled to the awardee. And it was not until the Act of August 23, 1862 (S.L. 1862, p. 27), that it was forbidden to issue a patent on such award without the boundaries having been defined.

In preparing Apana 35 for signature the clerk used the phrase "Eia na palena," characteristic of an award by survey, and copied in Bishop's survey which, as seen, bore a heading which we translate as follows: "Survey of the

---

[13] This sometimes is written "Penei na Palena."

Iliaina of Kumuulu with the upland at Waiau, Ewa, Oahu." Appended to the survey was a note signed by J. L. Nailiili as secretary or clerk, which has been translated as follows:

"Note of explanation:

"The plan of this land has not been entered in this book on account of its size, and only the survey has been copied. It is not plain in this Survey of A. Bishop of this land that he only surveyed the Ili of Kumuulu for Victoria Kamamalu, but by the title inscription of the plan, 'Ahupuaa of Waiau' perhaps it may be so perhaps not. If A. Bishop has surveyed the Ahupuaa proper of Waiau as shown in this plan, then no consideration can be given to this survey and this award in this book is not correct, and that the survey shall be forever disallowed, but if this survey is for the Ili of 'Kumuulu' then this award is proper and to be considered as correct."

From the spacing of the pages of the award book it is plain that all of the material appearing there, including the note, was copied into the award book at the same time. The survey and note were not added after the Commissioners signed, as contended by the State. It is a case in which the survey was ordered and copied into the award book after its receipt without the survey having been passed upon by the Land Commission. The survey nevertheless was subject to the approval of the Commissioners. *Cf., Rose* v. *Yoshimura,* 11 Haw. 30, 32 (1897).

The Commission was well aware of the importance of the survey. Speaking at a time prior to the authorization of awards by name by the Act of June 19, 1852 (S.L. 1852, p. 28), the Land Commission stated in the Principles adopted by it on August 20, 1846, and approved by the Legislative Council on October 26, 1846, S.L. 1847, p. 81 at 91:

"7th. Connected with each claim for land, is its configuration and superficial contents, without the ascertainment and demarkation of which, it were impossible to make an award, or to quiet the title as between neighboring proprietors. The Board is therefore under the necessity of causing each piece of land to be surveyed at the claimant's expense, before awarding upon it. * * *"

The surveyors, however, were thrown largely on their own. As stated by one of them, C. J. Lyons, in *Land Matters in Hawaii—No. 5,* Islander, 1875, p. 135, speaking of the surveying of kuleanas:

"* * * It was impossible for the Commissioners to go upon the ground, so that responsibility in a large measure depended on the surveyor."

Moreover, many of the surveyors were inaccurate, as stated by Arthur C. Alexander in Appendix A to his article "Land Titles and Surveys in Hawaii," published in the Hawaiian Planters' Record, 1920, vol. 23, pages 67-78. Alexander characterized A. Bishop as having "no conception of the value of accuracy * * *, consequently his surveys are extremely inaccurate and inconsistent." *Id.* at 76.

It thus appears that, under the practices followed, many issues could arise and require adjudication even after the awards had been copied into the award books. It is small wonder that corrections in the award books were routinely made, as this court noted in *State* v. *Hawaiian Dredging Co., supra,* 48 Haw. 152, 171, 397 P.2d 593, 605. In the case before us it appears that the point noted by J. L. Nailiili, Land Commission clerk, was one which still required adjudication. The Land Commission, in signing the award without disposing of the point so raised, failed to complete its work in respect of Victoria's claim to Kumuulu. The Land Commission could have crossed

out the note; or it could have crossed out the survey[14] and ordered another one; or it could have crossed out the survey and appended the reference to the Act of June 19, 1852 which was the earmark of an award by name.[15] But the Commission had no authority to award and not award at the same time.

It is doubtful that the clerk's note ever came to the attention of the Commissioners. It seems to have been Nailiili's theory that the note could be made and not disposed of by the Land Commission, but in this he was in error. Either the Land Commission was satisfied with the survey; or it was not satisfied and adopted a different survey; or it determined that the case was a proper one for an award by name. As the matter was left, the Land Commission made only a preliminary decision to the effect that Kumuulu had indeed been maheled to Victoria Kamamalu and had not been sold by her. There was nothing tantamount to final judgment. Compare *Kalama* v. *Kekuanaoa*, 2 Haw. 202 (1857). The way this matter was handled was similar to a court rendering a decision in favor of a plaintiff but stating in the decision that the form of judgment remained undetermined. If the court then went out of existence[16] the situation would be comparable to that before us.

It may be argued that an appeal should have been taken from the Land Commission's action, under Section VII of Article IV, Chapter VII of Part I, Second Act of Kamehameha III (S.L. 1846, p. 109). This Section VII

---

[14] The figures "2522," designating the number of acres at the end of the survey, appear to have been crossed out at some point, but it does not appear when this was done and the matter is of no great moment in view of the conclusions hereinafter reached.

[15] For example, Apana 27 evidently was originally intended to be an award by survey. The standard reference to the Act of June 19, 1852 was added when the award became one by name.

[16] Pursuant to the Act of July 20, 1854 (S.L. 1854, p. 21), the Land Commission was dissolved on March 31, 1855.

referred to the Act to Organize the Judiciary, Third Act of Kamehameha III, Article III of Chapter III of which provided in Section V for direct appeal to the Supreme Court from the "awards and decisions of the Board of Commissioners to quiet land titles" (S.L. 1847, p. 35). However, in this case there was no finality to the Land Commission's action, and an appeal could not have been taken. Perhaps mandamus would have been a remedy. *Cf., In the Matter of Waterhouse*, 2 Haw. 241, 251 (1860).

Despite the defective form of the award, the State does not contest that an award of some kind was made. It claims the award was by name. We need not decide whether this would be the proper effect to be given to the Land Commission's action had nothing further transpired. We have before us a patent issued on April 3, 1861, Royal Patent 4475, purporting to have been issued pursuant to the awards of the Land Commission. "Kumualii Ili ma Waiau" (Kumualii, Ili at Waiau) was included in the patent and cross-referenced to Apana 35 of Land Commission Award 7713, from which it is plain that Kumuulu was meant. The patent was endorsed by Lot Kamehameha as being the act of the King and Premier. This shows that it was authorized by the Minister of the Interior, Lot Kamehameha being the holder of that office. Under the Act of August 24, 1860 (S.L. 1860, p. 27), the Minister of the Interior was empowered to issue awards by name or by survey to chiefs who had failed to receive from the Land Commission the lands maheled to them. Hence, Victoria did perfect her title to Kumuulu in one way or another, whether by award of the Land Commission or of the Minister of the Interior.

We cannot agree with the court below that there was an award by the Land Commission by survey. The court's decision on this point stemmed from its view that Nailiili's note merely stated that the survey was improper if

Bishop had surveyed the entire Ahupuaa of Waiau, that Bishop did not survey the entire ahupuaa since he did not survey the other seven ilis, and that: "The survey must therefore be considered correct." As will appear, we do not think the court correctly construed the note. In any event, it was not possible for a survey to be incorporated into the award subject to later adjudication elsewhere as to its correctness. We accordingly hold that there was no award by the Land Commission by survey.[17]

The manner in which this claim was handled by the Land Commission was particularly unfortunate because, if the upland was not part of the Ili of Kumuulu, Victoria Kamamalu nevertheless had a good claim for it, by virtue of the King having given it to her, or to her mother from whom she inherited it. The approval by the King and Premier of the 1842 lease and the evidence of possession were ample basis for awarding of the upland under the Principles adopted by the Land Commission on August 20, 1846 and approved by the Legislative Council on October 26, 1846, S.L. 1847, p. 81, at 92. Though the application was based upon the Mahele, this defect could have been cured by an amendment despite the time for filing of claims having passed. *Cf.*, *Garcia* v. *Mendonca*, 7 Haw. 194 (1887).

Nailiili's concern was as to whether Bishop had surveyed land not part of the Ili of Kumuulu. As his note shows, his concern did not arise from the survey itself— which was of a single piece without separate description of the ten acre parcel—but from the map or plan accompanying it, particularly the inscription "Ahupuaa of Waiau" shown on the plan. He raised the question whether Bishop had surveyed the ahupuaa proper. Patently, there was no attempt by Bishop to depict on his map the outer

---

[17] We find it unnecessary to consider the State's contention that the costs paid were insufficient for the award to have been by survey.

boundaries of the ahupuaa in the sense of a land subdivision. "Ahupuaa" here was used in the sense of a unit under the feudal system, *i.e.,* what remained after excluding the ili kuponos.

Bishop's map, we must assume, represented information which the surveyor obtained from the kamaaina who accompanied him in making the survey. There is evidence in the record identifying this kamaaina, Kaaiakia by name. Twenty years later he testified before the Boundary Commissioner in a proceeding for the determination of the boundaries of Waimalu, shown on Bishop's map as lying east of Waiau. He said: "I pointed out boundaries to Rev. A. Bishop in surveying Waiau—say 20 years ago— also pointed out to Prof'r Alexander." He further testified that "Waiau and Waimanalo join each other to the mountain—there is no land between," but after another witness testified that "Waimano cuts off the upper part of Waiau, and Waimalu there adjoins Waimano," upon being recalled to the stand he agreed with this. One thus is left in some doubt as to his credibility. But we will proceed on the assumption that Bishop's map was an expression of kamaaina testimony, for whatever it was worth.

Bishop's map depicts an ahupuaa with only one ili in it, a parcel of about ten acres. Indisputably, there was held with the ili, by the same chief, *i.e.,* Kekuanaoa in behalf of Victoria Kamamalu, the upland or common land described in the 1842 lease, which was used by the hoaainas of the ili, or in which they had a right of use. According to the State's own evidence these lands were not the ahupuaa, since Puhi's holdings constituted the ahupuaa. According to other evidence, the name Kumuulu applied to the upland as well as the ten acre parcel. What transpired in connection with Piikoi's award is particularly significant. However, Bishop's map suggests that the kamaaina who accompanied Bishop deemed "Ahupuaa

of Waiau" the proper appellation for what was depicted by the map. Under this view, and since the wet land and the upland were held together, Kumuulu was an ili of the ahupuaa. But if this had been so, then according to *Harris* v. *Carter, supra,* 6 Haw. 195, 207 (opinion of a single justice, 1877), Kumuulu would have gone with the ahupuaa and would not have been separately recognized and treated in the Mahele. The treatment the ili received in the Mahele indicates it was an ili kupono.

Could the ili nevertheless have been an ili of the ahupuaa, which was separately set off to Victoria under a plan to divide the ahupuaa? If that had been the plan, Waiau would have been included in the list of lands surrendered by Victoria to the King, in order to carry out the division. The relinquishment by Victoria of a portion of the ahupuaa would no more have been overlooked than was the King's bestowal upon her of a portion.[18] There is a presumption in favor of the regularity and validity of official acts. *Territory* v. *Gay,* 26 Haw. 382, 396 (1922) ; *State* v. *Hawaiian Dredging Co., supra,* 48 Haw. 152, 181, 397 P.2d 593, 610.

The foregoing indicates that in the Mahele itself "Kumuulu" was deemed descriptive of an ili kupono comprised of both wet land and upland. The same appears thereafter, in 1851 and 1852. We have considered the question whether the use of the name Kumuulu in 1851, when the second lease was made, and in 1852, the time of Piikoi's award, was too recent to be of value, these dates being after the Mahele. In *Boundaries of Pulehunui, supra,* 4 Haw. 239, 240 (1879) it was stated that in the case of an award by name there was "intended to be assigned whatever was in-

---

[18] The State seems to recognize the weakness of its case if the wet land and upland were held together by one chief, that is, Kekuanaoa for Victoria Kamamalu, the State contending instead that the upland was separately held. But such is not the fact.

cluded in such tract according to its boundaries as known and used from ancient times." But it later was stated that one contesting a government claim on the ground of inclusion of the claimed land in an award by name should produce evidence "that the [name of land awarded] as known and understood at the time either of the Mahele or of the land commission award included [the land claimed by the government]," and that: "The question would be what passed by the award rather than what was referred to in the Mahele." *In re Pa Pelekane, supra,* 21 Haw. 175, 185 (1912). See also *Boundaries of Kahua 2, supra,* 20 Haw. 278, 284 (1910), in which there was testimony that certain land names were "purely of recent adoption" but the court found they were in use as early as 1853 and deemed this dispositive of the issue there presented. We conclude that defendants' evidence as to the 1851 and 1852 documents and proceedings is pertinent, and together with the 1842 lease constitutes a complete showing that the land in dispute was common land appurtenant to the Ili of Kumuulu, and was deemed a part of that ili and known by that name at the time of the Mahele and of the award. To counter this showing and to overcome the presumption of regularity,[19] there is only the suggestion made by Bishop's map that the proper appellation for the whole holding—the upland and wet land together—was "Ahupuaa of Waiau."

The court below did not take up the question of whether, other considerations aside, there was a genuine issue of fact presented by Bishop's map as to the extent of Kumuulu. It did not take up that question for the reason, among others, that it viewed the award as one by survey

[19] As above stated, if it be supposed that the upland and wet land together constituted the ahupuaa and that it was intended to divide the ahupuaa in the Mahele, presumably the relinquishment by Victoria of the upland would have been carried out along with the Mahele to her of the wet land. Since this was not done, the presumption is that no division was intended.

and not by name. This was one of the grounds of the summary judgment. As seen, we do not agree that there was an award by survey. However, there remains for consideration another ground of the summary judgment, that is, the matter of acquiescence in defendants' claim, reviewed below under the heading "Construction by the Parties." The review heretofore made of the situation of the land and the evidence as to the award will serve as a basis for the consideration of this further matter. We shall not attempt to resolve the question which, as noted, the court below did not take up. Even in the early cases, tried at a time when testimony was readily available, long continued possession sometimes was deemed the determinative factor in resolving a conflict as to the scope of an award. This is illustrated, we think, by *Boundaries of Paakea, supra,* 5 Haw. 154 (1884). Here, after a lapse of more than a century, with only a meager record available, we necessarily look to what has transpired in the meantime, seeking to compensate thereby for the loss of evidence over this long period of years if it is possible to do so.

## II. *Construction by the Parties.*

The State contends that "the theory of acquiescence cannot be applied against the State," citing *Garcia* v. *State,* 274 S.W. 319 (Tex. Civ. App.), which merely holds that the State is not bound by acts of private landowners in locating a common boundary. The State also cites *Bidwell* v. *McCuen,* 183 Iowa 633, 166 N.W. 369, 372, and *Langle* v. *Brauch,* 193 Iowa 140, 185 N.W. 28, 30, but the foundation of these cases is "that no one representing the public was authorized to enter into an agreement upon, or acquiesce in, any particular location [of the highway involved]." (166 N.W. at 372.) As will appear, such reasoning is inapplicable here.

Defendants cite, in answer to the State's contention that the theory of acquiescence cannot be applied against

the State, the cases of *In re Title of Kioloku,* 25 Haw. 357 (1920), *aff'd sub nom, Territory* v. *Hutchinson Sugar Plantation Co.,* 272 Fed. 856 (9th Cir. 1921); and *United States* v. *Fullard-Leo,* 331 U.S. 256 (1947). These were "lost grant" cases. Particularly in point is the following excerpt from *In re Title of Kioloku, supra:*

"* * * In the *Chaves* case [159 U.S. 452] the court said: * * * Nothing, it is true, can be claimed by prescription which owes its origin to, and can only be had by, matter of record; but lapse of time, accompanied by acts done or other circumstances, may warrant the jury in presuming a grant or title by record. Thus also, though lapse of time does not of itself furnish a conclusive bar to the title of the sovereign, agreeably to the maxim *nullum tempus occurrit regi,* yet if the adverse claim could have had a legal commencement, juries are advised or instructed to presume such commencement after many years of uninterrupted possession or enjoyment. * * *" (25 Haw. at 370.)

The State has attempted to distinguish these cases on the facts, but the distinctions sought to be made are inconsequential.[20] More important, the State has not met the proposition that the defendants' claim "could have had a legal commencement." We already have referred to the authority of the Minister of Interior with respect to maheled lands under the Act of August 24, 1860 (S.L. 1860, p. 27). A similar statute was enacted on December 16, 1892 (S.L. 1892, c. 68). Though a patent for Kumuulu by

---

[20] For example, the only comment made on *Fullard-Leo* is that in the Land Court "the Territorial government quitclaimed its interest * * *," and that "under such circumstances there was acknowledgment of private ownership * * *." In note 23 of the opinion (331 U.S. at 278-79) the court noted the position of the United States "that there was no power in Hawaii to disclaim any interest that the United States might have" and then stated: "We need not resolve this issue." The Land Court record was referred to simply as "another instance of the claims of respondent to Palmyra adverse to the claim of ownership of the United States and its predecessors * * *."

name was issued to Victoria Kamamalu in 1861, that did not mitigate against the possibility that another patent for the same property by metes and bounds could have issued, as would have been authorized. *Cf., Greenwell* v. *Paris,* 6 Haw. 315 (opinion of a single justice, 1882). And where, as here, the question was whether the title had remained in the government, there was no requirement that a Boundary Commissioner's certificate[21] precede the issuance of a patent by metes and bounds. The 1892 statute (S.L. 1892, c. 68) specifically provided that approval of the survey by the Surveyor General was sufficient.

The aforesaid Acts of August 24, 1860 and December 16, 1892, contained expiration dates. However, since the question here is one of the extent of the award, not the complete absence of an award, it is significant that, as early as 1876, the laws recognized that the government might "by quit claim, or otherwise, dispose of its rights in any land by way of compromise or equitable settlements of the rights of claimants * * *." (S.L. 1876, c. 44, § 2.) This represents another avenue by which defendants' claim might have been perfected. In the Land Act of 1895 (Sp. S.L. 1895, c. 26, § 17), it was provided that the President of the Republic, upon the recommendation of the Commissioners of Public Lands and with the approval of the Executive Council, might "execute quitclaim deeds for perfecting the titles of private lands where such titles are purely equitable or where such lands are suffering under defective titles, or in cases of claims to use of lands upon legal or equitable grounds." With the Governor of the Territory (subsequently the Governor of the State) substituted for the President of the Republic, the Commissioner of Public Lands substituted for the Commissioners of Public Lands, and the Executive Council omitted, these provisions be-

---

[21] The statutes concerning Boundary Commissioners are cited in note 22, *infra.*

came successively sections 254 and 276, R.L. 1905; sections 344 and 379, R.L. 1915; sections 442 and 479, R.L. 1925; sections 1554 and 1568, R.L. 1935; sections 4534 and 4535, R.L. 1945; and sections 99-43 and 99-44, R.L.H. 1955.[22] By S.L. 1962, c. 32, these sections were repealed, together with other provisions, and a new chapter was enacted; see R.L.H. 1955 (Supp. 1965), chapter 103A, especially section 103A-48. This was after the commencement of the present suit in 1960.

The "lost grant" doctrine, while adopted in the *Kioloku* case, *supra,* represents a fiction which this court is reluctant to apply here. It is a doctrine that perhaps requires re-examination. In this case, it is more realistic to recognize that an award was made, which was tantamount to a grant,[23] that the question is one of construction by the parties, and that the doctrine of construction by the parties is applicable. It cannot be said that no one representing the public was authorized to acquiesce[24] in the construc-

[22] It may be argued that the cited statutes conferred no authority to perfect a private title where the defective title arose out of an award by name, because of the provisions of the successive statutes relating to Boundary Commissioners. See S.L. 1862, p. 27; S.L. 1866, p. 19; S.L. 1868, p. 30; S.L. 1872, c. 21; S.L. 1874, c. 5; S.L. 1880, c. 44; S.L. 1888, c. 40; S.L. 1892, c. 52; S.L. 1894-5, c. 14, which as amended is now R.L.H. 1955, c. 234, Part I. However, these statutes are inapplicable. A dispute such as this could not have been settled by a Boundary Commissioner. That is, a Boundary Commissioner had no jurisdiction to determine a title dispute, except one arising solely by reason of adverse claims as to the location of the common boundary of two adjoining lands. *Boundaries of Paunau,* 24 Haw. 546 (1918). (We note that while the *Paunau* case cites the earlier case of *Board of Education* v. *Bailey,* 3 Haw. 702 (1876), it does not cite *Boundaries of Paakea, supra,* 5 Haw. 154 (1884). The lack of jurisdiction of a Boundary Commissioner over a title dispute seems not to have been clear before 1918, the date of the decision in the *Paunau* case.)

[23] *State* v. *Hawaiian Dredging Co., supra,* 48 Haw. 152, 176, 397 P.2d 593, 607; *cf., Territory* v. *Gay,* 26 Haw. 382, 396.

[24] There having been authority to act, the State may be bound by acquiescence in a matter of this nature. For example, the Constitution of the United States provides in Article I, section 10, clause 3, that compacts between states require the consent of Congress, but the consent of Congress to the settlement of boundaries between the states may be implied from its actions. *Virginia* v. *Tennessee,* 148 U.S. 503, 521-522.

tion of the award. Inapplicable here is the statement in *United States* v. *California,* 332 U.S. 19, 40, that: "[O]fficers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act."

We conclude that this is a case in which "we may look to evidence which shows the conduct of the parties with reference to the lands in dispute in so far as it legitimately reflects their intent with respect to the grant." *People* v. *Tahawus Purchase, Inc.,* 26 N.Y.S.2d 795, 814, *aff'd,* 268 App. Div. 100, 48 N.Y.S.2d 896. In that case, as in this, the action was in ejectment and was brought by the State for the purpose of establishing that a certain patent did not include a piece, there 187½ acres, in the possession of defendant. And in *State* v. *Hawaiian Dredging Co., supra,* 48 Haw. 152, 176, 397 P.2d 593, 607, where the dispute was between the State and private persons as to the extent of a Land Commission Award, the court ruled that:

"If considered ambiguous, the construction given a deed by the parties to it will be given effect unless it contravenes some rule of law."

The record shows more than mere possession[25] and payment of taxes on the part of defendants and their predecessors. If that were all the doctrine of construction by the parties would not apply, since the construction must be participated in by all. *Nahaolelua* v. *Heen,* 20 Haw. 613, 615 (1911). Nor do we hold that the mere failure of the State to dispute defendants' possession would call for invoking the doctrine of construction by the parties, even though there were several instances when lists of government lands in general, or unassigned lands in particular,

---

[25] There is ample evidence that possession was under claim of title by defendants and their predecessors under Land Commission Award 7713, Apana 35.

were compiled without Waiau being included. Here the record shows that in 1881, on a Hawaiian Government Survey map of Oahu, the upland of Waiau was designated "L.C.A. 7713 V.K.," *i.e.*, Victoria Kamamalu's Land Commission Award 7713. In 1890, following the opinion of this court in *Thurston* v. *Bishop, supra,* 7 Haw. 421 (1888), an act was passed "To Settle the Title to certain Unawarded Lands, and to Authorize a Compromise with the Trustees under the Will of the late Bernice Pauahi Bishop," (S.L. 1890, c. 78). This act recited that "Bernice Pauahi Bishop came into possession of certain lands which had been continuously held and claimed by her ancestors, now called unassigned lands, of which the following are at present in the possession of the Trustees of her estate," naming fifteen lands. It provided for the patenting to the trustees of certain of the named lands upon the quitclaim of the remainder of the named lands. The land here in dispute was not mentioned, although in possession of the trustees at that time as successors in interest to Victoria Kamamalu. It also is noteworthy that an 1892 report of the Minister of the Interior summarized the compromise thus effected and stated that "the whole question of the unassigned lands is practically settled." In 1902, on a Hawaii Territory Survey map, the upland of Waiau again was designated "L.C.A. 7713."

However, on July 24, 1912 the Government Surveyor reported to the Commissioner of Public Lands that "the Estate of B. P. Bishop has, through some mistaken idea of the boundaries of the ili of Kumuulu, made use of what seems to be, beyond any doubt, a valuable public property," basing this statement on Bishop's map and the Land Commission records. On November 19, 1918, an action of ejectment was brought by the then Territory of Hawaii to recover the land now in dispute and the forested area as well. Summons was served, but the case was never brought to

trial. It was voluntarily discontinued by the Attorney General in May, 1929. In the Index of Land Commission Awards published by the government that same year, Kumuulu, L.C.A. 7713, Apana 35, was listed as containing 2522 acres.

It is to be noted that the government had maintained on various occasions prior to 1929 that Kumuulu was unsurveyed. This was the purport of the listing of Kumuulu in the first Index of Land Commission Awards published in 1861. A predecessor of defendants agreed with the view that the boundaries had not been determined when, in 1873, he filed an application for the settlement of the boundaries of various lands, including Kumuulu, which however was not pursued as to the latter. Defendants suggest this was because of the Boundary Commissioner's statement in connection with the Austin application for settlement of the boundaries of Waimalu, which adjoins Waiau, that "Waiau is now settled by Bishop's survey * * *." However, a report to the Minister of the Interior by W. D. Alexander, Surveyor General, made in 1886, listed Kumuulu, cross-referenced to Royal Patent 4475, said to be "by name," as one of the lands the boundaries of which had not been settled; and an official publication made in June and July, 1924, pursuant to Act 208, S.L. 1919, as amended by Act 155, S.L. 1923, now R.L.H. 1955, sections 100-7-10, listed Kumuulu, L.C.A. 7713 Ap. 35, among the unsurveyed lands the boundaries of which were required to be legally determined before July 1, 1925, otherwise the Territory would have the same surveyed, and have the boundaries adjudicated, at the owner's expense. At the time of this publication the Territory's ejectment suit was pending, and in view of this there could have been no intention of stimulating action by the Bishop Estate to seek a determination of the extent of the Kumuulu award. The list, like other such lists, was simply a

list of unsurveyed lands. Such lists, in and of themselves, did not signify a government claim, though they were indicative of uncertainty. The Minister of the Interior noted in a report in 1882 that as the surveys were completed more Government lands will be found." Subsequently, as seen, the government made the claim which resulted in the 1918 ejectment action.

After the discontinuance of the 1918 ejectment action in 1929, there was a period of more than thirty years before any further dispute was raised, the present action being brought in 1960. During this thirty-year period, action was taken which we deem decisive in view of the fact that prior thereto the title dispute had been brought to light, aired, and dropped, and this at a time when *In re Title of Kioloku, supra,* had already been decided; and in view also of participation in the below reviewed action by the Governor and Commissioner of Public Lands in whom was vested the statutory authority which continued during this period as above set out.

In 1937, the Territory entered into an exchange deed, executed on behalf of the Territory by the Governor and Commissioner of Public Lands, reciting that Parcels F and G therein described, were "portion[s] of R.P. 4475, L.C. Award 7713, Apana 35, to Victoria Kamamalu, at Waiau, Ewa, Oahu." Parcel F had its point of beginning at the boundary of Waimalu, to the east of the ten acre parcel which the State now says comprised the award. This portion of Parcel F was separated from the ten acre piece by the Ili of Kauhihau, and according to the State's present contention that the Ili of Kumuulu lay below the paaina, all of Parcel F was outside of Victoria's award. Parcel G lay to the west of the ten acre piece, being separated from it by Piikoi's award, the Ili of Kaluaoopu.

In 1938 there was another exchange deed executed on behalf of the Territory by the Governor and Commissioner

of Public Lands, making similar recitals as to certain parcels outside the area now contended to have comprised the award.

In 1945, the Territory commenced a condemnation suit, Law No. 17749, Parcels 80, 84, and 87 of which, described as "portion[s] of R.P. 4475, L.C. Aw. 7713, Apana 35 to V. Kamamalu," were outside the ten acre parcel, two of the pieces being west of Piikoi's award, while one was to the north of that award. On March 19, 1953, a stipulation was entered into for the acquisition of these and other parcels, the stipulation including the point "that the Bishop Estate is the owner in fee simple of said lands, free from encumbrances." This again is significant as showing acquiescence in defendants' claim.[26]

Our decision does not countenance acquiescence by public officials in an unfounded claim. As shown by Part I of this opinion, such is not the situation. At least in respect of the land involved in this suit, the public officials could well have concluded that further litigation would be fruitless. From what occurred following the 1912-1929 period we must take it that they did so conclude, and that they intended to abandon the issue now presented. There has emerged a pattern of construction by the parties which tips the scale against the present suit. Plaintiff cannot sustain the burden of proof resting upon it in ejectment. *Cf., Deponte* v. *Ulupalakua Ranch,* 48 Haw. 17, 395 P.2d 273, *rehearing denied,* 48 Haw. 149, 396 P.2d 826.

### III. *Admissibility of Certain Exhibits.*

The conclusions we have reached make it unnecessary to dwell on Specification of Error II, relating to the admissibility of certain of defendants' exhibits. Exhibit GG,

---

[26] We make no holding that this condemnation suit was the basis for a judicial estoppel against the State as to land other than the parcels there involved, since the question now at issue was stipulated and not actually litigated. *Cf., United States* v. *International Bldg. Co.,* 345 U.S. 502.

offered in respect to the payment of taxes, was admissible, the only objection being based on an affidavit by the Director of Taxation which we find does not support the objection. The other exhibits objected to have been given no significance, except as and to the extent they show that defendants have claimed title under Land Commission Award 7713, for which purpose they are admissible.

Judgment affirmed.

*Kenneth K. Saruwatari,* Assistant Attorney General (*Bert T. Kobayashi,* Attorney General, *Jon J. Chinen* and *Clinton R. Ashford,* Special Deputy Attorneys General with him on the briefs) for plaintiff-appellant.

*J. Garner Anthony* (*Burnham H. Greeley* with him on the briefs, *Robertson, Castle & Anthony* of counsel) for defendants-appellees.